**FILED**

AUG 1 6 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HUSSAIN SALEM MOHAMMED ALMERFEDI, *et al.*, Petitioners, | ) ) ) ) ) ) ) | CASE NUMBER  1:05CV01645 JUDGE: Paul L. Friedman DECK TYPE: Habeas Corpus/2255 DATE STAMP: 08/16/2005 |
| *v.* | ) ) | |
| GEORGE W. BUSH, *et al.*, Respondents. | ) ) ) ) | |

Civil Action

**MOTION FOR ORDER REQUIRING RESPONDENTS TO PROVIDE COUNSEL
FOR PETITIONER AND THE COURT WITH 30-DAYS' ADVANCE NOTICE OF
ANY INTENDED REMOVAL OF PETITIONER FROM GUANTÁNAMO**

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and the All Writs Act, 28

U.S.C. § 1651, Petitioner Hussain Salem Mohammed Almerfedi respectfully moves for an order

requiring Respondents to provide counsel for Petitioner and the Court with advance notice of any

intended removal of Petitioner from Guantánamo Bay Naval Base in Cuba. On information and

belief, Respondents have contemplated or are contemplating the removal of some detainees from

Guantánamo to foreign territories for torture or indefinite imprisonment without due process of

law. Petitioner is requesting this advance notice to enable his counsel to contest any such

removal from Guantánamo and to preserve the jurisdiction of the Court in this matter.

1

## STATEMENT OF FACTS

Petitioner Hussain Salem Mohammed Almerfedi is a Yemeni national who is being detained at the Guantánamo Bay Naval Base in Cuba. As detailed in Petitioner's habeas petition filed on August 11, 2005, Petitioner denies being an "enemy combatant" and contends that his detention is illegal under the United States Constitution, U.S. law, and international law.

Petitioner has reason to fear that he will be transferred to a country where he will be tortured and/or detained indefinitely without due process of law.

Upon information and belief, the United States has removed detainees and others suspected of terrorist crimes to other countries for interrogation or detention without complying with extradition or other legal process. This practice, known as "rendition," "irregular rendition" or "extraordinary rendition," is understood to be used to facilitate interrogation by subjecting detainees to torture.

According to reports by American and foreign news organizations, including the *Washington Post*, the *Los Angeles Times* and the British Broadcasting Corporation, the United States Government has repeatedly transferred detainees into the custody of foreign governments that employ inhumane interrogation techniques. According to a recent article in the *New Yorker*, the "rendition" process was originally "a program aimed at a small, discrete set of suspects – people against whom there were outstanding foreign arrest warrants," but after September 11 came to include a "wide and ill-defined population that the Administration terms 'illegal enemy combatants.'" Jane Mayer, *Outsourcing Torture*, New Yorker, Feb. 14, 2005, at ¶ 7. According to the *Washington Post*,

> Since Sept. 11, the U.S. government has secretly transported
> dozens of people suspected of links to terrorists to countries other
> than the United States, bypassing extradition procedures and legal

2

> formalities, according to Western diplomats and intelligence
> sources. The suspects have been taken to countries . . . whose
> intelligence services have close ties to the CIA and where they can
> be subjected to interrogation tactics – including torture and threats
> to families – that are illegal in the United States, the sources said.
> In some cases, U.S. intelligence agents remain closely involved in
> the interrogation, the sources said.

Rajiv Chanrasekaran & Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects*, Wash. Post,

Mar. 11, 2002, at A1; *see also* Dana Priest & Barton Gellman, *U.S. Decries Abuse But Defends*

*Interrogations,* Wash. Post, Dec. 26, 2002, at A1. The countries to which detainees may be

brought are known to practice torture. *See, e.g.*, Megan K. Stack & Bob Drogin, *Detainee Says*

*U.S. Handed Him Over For Torture,* L.A. Times, Jan. 13, 2005, at A1 ("News accounts,

congressional testimony and independent investigations suggests that [the CIA] has covertly

delivered at least 18 terrorism suspects since 1998 to Egypt, Syria, Jordan and other Middle

Eastern nations where, according to State Department reports, torture has been widely used on

prisoners.").

According to recent news accounts, Guantánamo detainee Mamdouh Habib (not the

Petitioner) was rendered to Egypt by the United States *before* being moved to Cuba. During his

six months in Egyptian custody, Mr. Habib was allegedly tortured without mercy:

> He said that he was beaten frequently with blunt instruments,
> including an object that he likened to an electric "cattle prod." And
> he was told that if he didn't confess to belonging to Al Qaeda he
> would be anally raped by specially trained dogs. . . . Habib said
> that he was shackled and forced to stand in three torture chambers:
> one room was filled with water up to his chin, requiring him to
> stand on tiptoe for hours; another chamber, filled with water up to
> his knees, had a ceiling so low that he was forced into a prolonged,
> painful stoop; in the third, he stood in water up to his ankles, and
> within sight of an electric switch and a generator, which his jailers
> said would be used to electrocute him if he didn't confess.

3

Mayer, *Outsourcing Torture* at ¶ 54. The credibility of Mr. Habib's account is bolstered
by the State Department, which has consistently identified the Egyptian government as a
practitioner of torture. In a report released on February 28, 2005, for example, the State
Department found that "there were numerous, credible reports that security forces tortured and
mistreated detainees" and that "torture and abuse of detainees by police, security personnel, and
prison guards remained common and persistent." Dep't of State, *Country Reports On Human
Rights Practices, Egypt 2004*, at http://www.state.gov/g/drl/rls/hrrpt/2004/41720.htm, § 1(c).

Respondents are currently negotiating with other countries to facilitate the return of
Guantanamo detainees en masse to their countries of citizenship, including Yemen. Robin
Wright and Josh White, *U.S. Holding Talks on the Return of Detainees: Administration Close to
Reaching Agreements with 10 Muslim Countries*, Washington Post (Aug. 9, 2005) at A13.
Rather than allowing the detainees a meaningful opportunity to challenge the facts of their
confinement and to possibly return to their home countries as free men, under the terms of these
proposed agreements between the United States and the return countries, the United States seeks
to retain the right to further interrogate the detainees and to have "input" into when the detainees
will be released. *Id.* Moreover, recent news reports indicate that the United States government
has contemplated transferring "large numbers of Afghan, Saudi and Yemeni detainees from the
military's Guantánamo Bay, Cuba, detention center into new U.S.-built prisons in their home
countries." Dana Priest, *Long-Term Plan Sought For Terror Suspects*, Wash. Post, Jan. 2, 2005,
at A1.

4

Petitioner, because he is a Yemeni citizen, has reason to fear that he will be transferred into the custody of the government of Yemen. The human rights practices of Petitioner Waleed Saeed Bn Saeed Zaid's home country of Yemen are such that they provide a basis for his legitimate fear of imminent harm if transferred. *See Country Reports on Human Rights Practices, 2004*, U.S. Department of State, (released in February 2005), *available at* http://www.state.gov/g/drl/rls/hrrpt/2004/41736.htm (last visited at August 6, 2005). That report described the Yemeni justice system as follows:

> [T]here were reports that members of the...police forces tortured and abused persons in detention. There were also reports that authorities used force during interrogations, especially against those arrested for violent crimes...[T]here were reports [of] abuse such as sleep deprivation, cold water, and threats of sexual assaults. There were reports that the CID routinely used torture in order to obtain confessions...The Constitution may be interpreted as permitting amputations, in accordance with Shari'a (Islamic law), and physical punishment such as flogging for some crimes.
>
> ...Prisons were extremely overcrowded, sanitary conditions were poor, and food and health care were inadequate to nonexistent. Prison authorities often exacted bribes from prisoners to obtain privileges, or refused to release prisoners who completed their sentences until family members paid a bribe. In some cases, authorities arrested without charge and held refugees, persons with mental disabilities, and illegal immigrants in prisons with common criminals.
>
> ...[A]rbitrary arrest and prolonged detention without charge remained common practices.
>
> ...A large percentage of the total prison population consisted of pretrial detainees, some of whom have been imprisoned for years without charge.

Id.

Petitioner also has reason to fear that he might be rendered to a third country for continued illegal detention without due process of law. On information and belief, a number of detainees have been removed to countries – including Pakistan and Kuwait – where they have

5

been imprisoned and denied access to the courts.

## ARGUMENT

Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power "to issue injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Envtl. Def. Fund v. EPA*, 485 F.2d 780, 784 n.2 (D.C. Cir. 1973). Petitioner's request meets the most fundamental purpose of preliminary injunctive relief, "to preserve the status quo between the parties pending a final determination of the merits of the action." 13 Moore's Federal Practice 3d, § 65.20 (2004). Each of the four factors to be weighed in awarding preliminary injunctive relief favors the requested injunction here: (1) Petitioner will suffer irreparable harm if the injunction is denied; (2) no harm will be suffered by Respondents if the injunction is granted; (3) Petitioner is likely to succeed on the merits of his claims; and (4) there is a clear public interest in preventing the United States Government from rendering individuals to foreign countries for detention and torture. *See Al-Fayed v. CIA*, 254 F.3d 300, 303 & n.2 (D.C. Cir. 2001); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

### A. The Petitioner will suffer irreparable harm if the injunction is denied and the Respondents will suffer none if it is granted.

Petitioner stands to suffer immeasurable and irreparable harm – from torture to possible death – at the hands of a foreign government like Yemen, Egypt, or Jordan. Transfer to another country, even if "only" for continued imprisonment, also circumvents Petitioner's right to adjudicate the legality of his detention in this Court. By contrast, Respondents are asked only to provide counsel and the Court with adequate notice of any intended removal of the Petitioner

from Guantánamo. They have had Petitioner in their custody for years, yet have not, on

information and belief, charged Petitioner as an "enemy combatant." Respondents can suffer no

conceivable harm from complying with such a request.

**B. The Petitioner is likely to succeed on the merits of his claims.**

The Petitioner has properly invoked the jurisdiction of this Court. *See Rasul v. Bush,* 124

S. Ct. 2686, 2698 (2004). The Petitioner is also likely to be successful in at least one of his

numerous claims challenging the fact of his detention. The Petitioner has raised such claims

under, *inter alia,* the Due Process Clause of the U.S. Constitution, the Geneva Conventions, and

treaty-based and customary international law.

**C. Finally, public policy favors requiring Respondents to provide advance notice to counsel and the Court of any intended removal of the Petitioner from the Court's jurisdiction.**

No matter how satisfied the Executive Branch may be that its actions are lawful, the

public good requires that a federal litigant – properly before the Court and represented by

counsel – be provided with a meaningful opportunity to contest his transfer into the hands of

those who might torture him or detain him indefinitely.

**CONCLUSION**

For the foregoing reasons, this motion should be granted giving this Court and

Petitioner's counsel 30 days advance notice of any proposed transfer of Mr. Hussain Salem

Mohammed Almerfedi.

Dated: August 11, 2005

Respectfully submitted,

Judith Brown Chomsky, Esq. (PA21537)
LAW OFFICES OF JUDITH BROWN CHOMSKY
Post Office Box 29726
Elkins Park, PA 19027
Telephone: (215) 782-8367
Facsimile: (215) 782-8368

8