**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HUSSAIN SALEM MOHAMMED ALMERFEDI, et al., Petitioners, v. GEORGE W. BUSH, et al., Respondents. | Civil Action No. 05-1645 (PLF) |
| WALEED SAEED BN SAEED ZAID, et al., Petitioners, v. GEORGE W. BUSH, et al., Respondents. | Civil Action No. 05-1646 (PLF) |

**RESPONDENTS' MEMORANDUM IN OPPOSITION TO**
**PETITIONERS' MOTION FOR PRELIMINARY INJUNCTION**
**REQUIRING ADVANCE NOTICE OF TRANSFER OR RELEASE**

Respondents hereby respond to petitioners' motions for preliminary injunctions requiring

respondents to provide the Court and petitioners' counsel with advance notice of any transfer or

release of petitioners from Guantanamo.[1]  Petitioners' motions should be denied because they

have not come close to establishing a factual or legal basis for the relief they seek.[2]

---

[1] Because the motions in <u>Almerfedi</u> and <u>Zaid</u> are carbon copies of one another, were filed by the same counsel, and were filed near simultaneously, to avoid needless duplication of paper respondents submit this single opposition in both cases on a consolidated basis.

[2] Similar motions have been filed over the past three months in numerous other Guantanamo detainee habeas cases, with varying outcomes.  <u>Compare</u>, <u>e.g.</u>, <u>Abdah v. Bush</u>, Civ.
(continued...)

## BACKGROUND

**A.    Detention of Enemy Combatants at Guantanamo**

Following the terrorist attacks of September 11, 2001, pursuant to his powers as

Commander in Chief and with congressional authorization, see Authorization for Use of Military

Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), the President dispatched the United States

Armed Forces to seek out and subdue the al Qaeda terrorist network and the Taliban regime and

others that had supported it.  In the course of those hostilities, the United States has captured or

taken custody of a number of foreign nationals as enemy combatants, some of whom are being

held at the Guantanamo Bay Naval Base ("Guantanamo") in Cuba.

**B.    Repatriation and Transfer of Enemy Combatant Detainees at Guantanamo**

Although the laws of war permit the United States to hold enemy combatants in detention

for the duration of hostilities, the United States has no interest in detaining any individuals longer

than necessary.  See Declaration of Deputy Assistant Secretary of Defense for Detainee Affairs

Matthew C. Waxman dated June 2, 2005 ("Waxman Decl.") ¶ 3; Declaration of Ambassador

---

[2](...continued)
A. No. 04-1254 (HHK), 2005 WL 711814 (D.D.C. Mar. 29, 2005) (granting preliminary
injunction), with Kurnaz v. Bush, Civ. A. No. 04-1135 (ESH), 2005 WL 839542 (D.D.C. Apr.
12, 2005) (granting preliminary injunction only as to transfers other than for release), with Al-
Oshan v. Bush, Civ. A. No. 05-520 (RMU) (D.D.C. Mar. 31, 2005) (ordering advance notice as
part of stay), with Deghayes v. Bush, Civ. A. No. 04-2215 (RMC) (D.D.C. June 15, 2005)
(denying preliminary injunction but requiring notice to the Court of any decision to transfer a
particular individual to a particular country), with Almurbati v. Bush, 366 F. Supp. 2d 72
(D.D.C. 2005) (denying preliminary injunction); Al-Anazi v. Bush, 370 F. Supp. 2d 188 (D.D.C.
Apr. 21, 2005) (same); Mammar v. Bush, Civ. A. No. 05-573 (RJL), slip op. (D.D.C. May 2,
2005) (same).

Respondents have taken interlocutory appeals of the orders requiring advance notice.

Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl.") ¶ 2.[3]  The Department of Defense ("DoD") conducts at least annual reviews of each Guantanamo detainee to determine whether continued detention is warranted based on factors such as whether the detainee continues to pose a threat to the United States and its allies.  Waxman Decl. ¶¶ 3, 7; Prosper Decl. ¶ 2.  Those annual reviews include those currently being conducted through Administrative Review Boards. See Waxman Decl. ¶¶ 3, 7.[4]  As part of the Administrative Review Board process, counsel who represent detainees have been invited to make written submissions concerning whether further detention is appropriate; in these submissions, counsel are free to raise, and in fact have raised, any concerns about transfer or repatriation, and have in fact made such submissions.

Following consultation with various agencies, a senior Department of Defense official grants the ultimate approval for the transfer of any Guantanamo detainee to the control of another government.  Waxman Decl. ¶¶ 6-7; Prosper Decl. ¶¶ 2-3, 7.  Over 200 Guantanamo detainees have been so transferred, over a period spanning several years.  Waxman Decl. ¶ 4; Prosper Decl.

---

[3] The June 2, 2005 Waxman Declaration submitted herewith replaces and supersedes two prior declarations by Deputy Assistant Secretary Waxman submitted in connection with similar motions in other Guantanamo detainee cases.  See Waxman Decl. ¶ 1.  The Prosper Declaration submitted herewith was originally submitted in connection with a similar motion in Abdah, Civ. A. No. 04-1254 (HHK), but is equally applicable to the instant case.  Certain numerical information in the declarations is subject to updating.  See infra note 5.

[4] See generally Memorandum of the Deputy Secretary of Defense dated May 11, 2004, re: Administrative Review Procedures for Enemy Combatants in the Control of the Department of Defense at Guantanamo Bay Naval Base, Cuba, available at <<http://www.defenselink.mil/news/May2004/d20040518gtmoreview.pdf>>; Memorandum dated September 14, 2004, re: Implementation of Administrative Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, available at <<http://www.defenselink.mil/news/Sep2004/ d20040914adminreview.pdf>>.

¶ 2.[5]

Where continued detention by the United States is not warranted, a detainee may be transferred to the control of another government, typically the government of his country of citizenship, for release. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3. The United States also transfers Guantanamo detainees, under appropriate circumstances, to the control of other governments for continued detention, investigation, and/or possible prosecution when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3. Such governments can include the government of a detainee's country of citizenship, or another country that may have law enforcement, prosecution, or other interest in the detainee. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.

Such transfers to the control of other governments for continued detention, investigation, and/or prosecution occur after a dialogue between the United States and the receiving government, which may have been initiated by either the United States or the receiving government. Waxman Decl. ¶ 5. The purpose of such dialogue is to ascertain or establish what measures the receiving government intends to take, pursuant to its own domestic laws and independent determinations, that will ensure that the detainee will not pose a continuing threat to the United States and its allies. Id. In all cases where a transfer is consummated, the detainee is transferred entirely to the custody and control of the other government; once transferred, the

---

[5] As an update to certain information provided in the attached declarations, at last count, 245 detainees have been transferred by the Defense Department from Guantanamo, of which 177 were transferred for release. See Department of Defense Press Release, "Detainee Transfer Announced," August 22, 2005, available at <<http://www.defenselink.mil/news/detainees.html>>.

individual is no longer in the custody or control of the United States.  Id.  Any future detention of that individual is by the foreign government pursuant to its own laws and not on behalf of the United States.  Id.  In fact, most of the Guantanamo detainees who have been transferred by the Department of Defense to the control of their home countries for continued detention, investigation, and/or prosecution have been released from detention some time after the transfer. Id.

In any transfer, a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6-7.  It is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.  If a transfer is deemed appropriate, a process is undertaken, typically involving the Department of State, in which appropriate assurances regarding the detainee's treatment are sought from the country to whom the transfer of the detainee is proposed.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 5.  Once the Department of Defense approves a transfer and requests the assistance of the Department of State, the Department of State initiates transfer discussions with the foreign government concerned.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 6.  Such discussions include an effort to seek assurances that the United States Government considers necessary and appropriate for the country in question, including assurances of humane treatment and treatment in accordance with the international obligations of the foreign government accepting transfer.  Id.  Among other things, the Department of State considers whether the nation in question is a party to relevant treaties such as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and pursues

more specific assurances if the nation concerned is not a party or other circumstances warrant.

Id.

        The determination whether it is more likely than not an individual would be tortured by a receiving foreign government, including, where applicable, evaluation of foreign government assurances, involves senior level officials and takes into account a number of considerations, including whether the nation concerned is a party to certain treaties; the expressed commitments of officials of the foreign government accepting transfer; the particular circumstances of the transfer, the country, and the individual concerned; and any concerns regarding torture that may arise.  Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7.  Recommendations by the State Department are developed through a process involving the Bureau of Democracy, Human Rights, and Labor (which drafts the State Department's annual Country Reports on Human Rights Practices) and the relevant State Department regional bureau, country desk, or U.S. Embassy.  Prosper Decl. ¶ 7.  When evaluating the adequacy of assurances, State Department officials consider the identity, position, or other information concerning the official relaying the assurances; political or legal developments in the foreign country concerned that provide context for the assurances; and the foreign government's incentives and capacity to fulfill its assurances to the United States. Prosper Decl. ¶ 8.  In an appropriate case, the State Department may consider various monitoring mechanisms for verifying that assurances are being honored.  Id.  If a case were to arise in which the assurances obtained from the receiving government were not sufficient when balanced against treatment concerns, the United States would not transfer a detainee to the control of that government unless the concerns were satisfactorily resolved.  Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.  Indeed, circumstances have arisen in the past where the Department of Defense decided not to

transfer detainees to their country of origin because of mistreatment concerns.  Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.

The United States' ability to seek and obtain assurances from a foreign government depends on its ability to treat its dealings with the foreign government with discretion.  Prosper Decl. ¶ 9; Waxman Decl. ¶ 8.  Obviously, diplomatic sensitivities surround the Department of State's communications with foreign governments concerning allegations relating to torture. Prosper Decl. ¶ 9; Waxman Decl. ¶ 8.  The United States Government typically does not unilaterally make public any specific assurances or other precautionary measures obtained, because such disclosure would have a chilling effect on and cause damage to our ability to conduct foreign relations.  Prosper Decl. ¶ 9.  If the United States Government were required to disclose its communications with a foreign government relating to particular mistreatment or torture concerns outside appropriate Executive Branch channels, that government and potentially other governments would likely be reluctant to communicate frankly with the United States concerning such issues in the future.[6]  Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8.  As a result, disclosure could impede our country's ability to obtain vital cooperation from concerned governments with respect to military, law enforcement, and intelligence efforts related to the war on terrorism.  Waxman Decl. ¶ 8; Prosper Decl. ¶ 12.

---

[6] Another reason such disclosure would be harmful is that the State Department's recommendation concerning transfer relies heavily on facts and analyses provided by Embassies and other State Department offices, and confidentiality is necessary to ensure that the advice and analysis provided by those offices are useful and informative for the decision-maker.  Prosper Decl. ¶ 11.  Disclosure of their assessments could chill important sources of information and interfere with the ability of our foreign relations personnel to interact effectively with foreign state officials.  Id.

**ARGUMENT**

## I.    PRELIMINARY INJUNCTION STANDARD

It is well-established that a request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004).  To prevail in a request for a preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'"  See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

In particular, the irreparable harm that must be shown to justify a preliminary injunction "must be both certain and great; it must be actual and not theoretical."  Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."  Id. (citations and internal quotation marks omitted; emphasis in original).[7]

---

[7] Some Judges of this Court have entered the functional equivalent of preliminary injunctive relief as a component of a stay of proceedings related appeals.  As Judge Bates concluded, however, "if the petitioners cannot meet the prerequisites of a motion for preliminary injunction . . . it is unlikely that they should receive that same relief through the backdoor of a stay."  Al-Anazi, 370 F. Supp. 2d at 199 n.11 (citing Laborers' Intern. Union of North Am. v. Nat'l Post Office Mail Handlers, 1988 WL 142384, at *1 (D.D.C. Dec. 23, 1988)).  Thus, in
(continued...)

**II.     PETITIONERS FAIL TO SHOW IRREPARABLE INJURY**

**A.     The Mooting of a Habeas Claim that Naturally Flows From Relinquishment of United States Custody Does Not Constitute Irreparable Injury Justifying a Preliminary Injunction**

Some Judges of this Court have required advance notice of any transfer through a preliminary injunction or otherwise in order to "protect" or "preserve" the Court's jurisdiction, reasoning that a transfer would or could extinguish the transferred detainee's habeas claims and curtail the Court's review of the legality of his detention. Respondents respectfully suggest that these decisions rest on faulty logic. The ultimate relief sought by petitioners in these habeas corpus cases is obviously release from custody. Any right to challenge the legality of one's detention through a habeas proceeding cannot reasonably extend so far as to require that detention be continued, after the Executive determines that the military rationales for enemy combatant detention no longer warrant such custody, for no reason other than to be able to test the legitimacy of detention the Executive no longer is interested in maintaining.[8] "The ultimate

_____

[7](...continued)
whatever form of order the inherently-injunctive-in-nature relief petitioners seek might be embodied, petitioners should be required to satisfy the preliminary injunction standard in order to justify that relief.

[8] Transfers of Guantanamo detainees are not undertaken in order to thwart the jurisdiction of the Court. Waxman Decl. ¶ 3. Indeed, such transfers have been occurring since October 2002, long before the June 28, 2004 Rasul Supreme Court decision and the proliferation of detainee habeas petitions that it spawned in this Court. Waxman Decl. ¶ 4. As Judge Bates noted, 131 transfers (i.e., more than half of the transfers to date) had occurred three months or longer before Rasul was decided, "thus casting doubt on petitioners' suggestion that DOD is undertaking a policy of transfer in order to thwart the jurisdiction of the courts." Al-Anazi, 370 F. Supp. 2d at 196 n.7 (citing Dep't of Defense, Transfer of Afghani and Pakistani Detainees Complete (Mar. 15, 2004), available at http://www.defenselink.mil/releases/2004/nr20040315-0462.htm); see also supra note 4 (citing documents showing that administrative review process for considering transfers and repatriations predates Rasul and the filing of these and most other

(continued...)

9

objective of a habeas petition is release from custody." Almurbati, 366 F. Supp. 2d at 78. As Judge Walton found, "once the respondents release the petitioners from United States custody . . . they will have obtained the result requested and at that point there will be no further need for this Court to maintain jurisdiction." Id. at 80; see also Al-Anazi, 370 F. Supp. 2d at 198 ("Every habeas petition, including this one, is ultimately about obtaining release from detention, and where, as here, the United States will relinquish custody of the detainee to the home government there is nothing more the Court could provide to petitioners." (citation omitted)).

That release from United States custody will give petitioners all the relief they can seek through habeas is not altered by the fact that, upon being released from the custody of the United States, a former detainee may be taken into custody and detained in the receiving country based on that country's independent interests and determinations. As respondents' declarations make clear, when the Department of Defense transfers detainees to the control of other governments, the detainees are no longer subject to the custody or control of the United States, and any subsequent confinement in the receiving country is based on the receiving government's independent decision, based on its domestic laws, that the individual should be detained. Waxman Decl. ¶ 5. Indeed, even if the United States transfers a detainee to his home government with the understanding that, from the United States' perspective, he can be released, the home government may well subsequently take any law enforcement or investigatory action against the former detainee that it may deem appropriate under its laws. The Court should therefore reject petitioners' suggestion that the possibility of future detention in an individual's

---

[8](...continued)
detainee habeas petitions).

home or another country based on that country's independent interests and determinations

constitutes irreparable injury warranting an injunction.[9]

**B.      Speculation that the United States Will Defy its Own
        Policy by Transferring Detainees to Countries in
        Circumstances Where it is Believed They Will be Tortured
        Does Not Warrant a Preliminary Injunction**

Nor can petitioners carry their burden to show irreparable injury that is "certain and great

. . . actual and not theoretical," Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985),

by rife speculation that, contrary to the policies and processes attested to in the sworn

declarations of high-level Executive Branch officials, the United States has designs to send

petitioner to a country in circumstances where he will be tortured.  Those declarations, after all,

make clear that it is the policy of the United States not to repatriate or transfer a detainee to a

country when the United States believes, based on a number of factors and considerations, it is

more likely than not that the individual will be tortured there.  Prosper Decl. ¶ 4; Waxman Decl.

¶ 6.  This policy is implemented through a process that contains several levels of precautions and

safeguards.  To conclude that an injunction is nevertheless necessary would require the Court to

assume, without any evidence, that the United States' policy and practice is somehow a sham or

pretext.  There is no valid basis for such an assumption.

---

[9] In ordering advance notice, some Judges of this Court have relied upon the decision in
Abu Ali v. Ashcroft, 350 F. Supp. 2d 28 (D.D.C. 2004), as illustrating that a transfer could
hypothetically result in some type of "constructive custody" situation.  However, the declarations
submitted herewith make clear that any transfer to a foreign government is a complete transfer in
which the United States relinquishes custody entirely, refuting the notion of a "constructive
custody" relationship.  For that reason as well as several other important distinctions, the author
of the Abu Ali decision described it as "not particularly instructive" in the context of these
Guantanamo detainee motions seeking advance notice of transfers.  Al-Anazi, 370 F. Supp. 2d at
197 n.9.

Rather, as Judge Walton has found, respondents' sworn declarations "directly refute the petitioners' allegations of their potential torture, mistreatment and indefinite detention to which the United States will in some way be complicit." Almurbati, 366 F. Supp. 2d at 78. Moreover, Judge Bates found that the assortment of magazine and newspaper stories relied upon by many detainee-petitioners in these cases failed to form a factual predicate justifying an injunction, noting that, among other problems with relying on such materials, "[p]etitioners [in that case] concede that none of these incidents involve the transfer of detainees out of Guantanamo." Al-Anazi, 370 F. Supp. 2d at 190-91; see also id. at 196. Thus, petitioners have failed to show that either the prospect of relinquishment from United States custody or unfounded speculation about possible torture in a foreign country constitute irreparable harm that must be remedied by a preliminary injunction.

### III.    PETITIONERS CANNOT SHOW A LIKELIHOOD OF SUCCESS IN OBTAINING A COURT ORDER PREVENTING A TRANSFER IN ACCORDANCE WITH THE POLICIES EXPRESSED IN RESPONDENTS' DECLARATIONS

Petitioners fare no better on the second prong of the preliminary injunction analysis, which requires them to show that they are likely to succeed, following notice, in preventing a transfer from Guantanamo.

To be clear, whatever the merits of the issues currently before the D.C. Circuit in the ongoing appeals in Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005), appeals docketed, Nos. 05-5062, 05-5063 (D.C. Cir. Mar. 2, 2005), and In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443 (D.D.C. 2005), appeal on petition for interlocutory appeal, No. 05-5064 et al. (D.C. Cir.), and of petitioners' claims that they are being wrongfully detained, it is not the likelihood of

success on <u>those</u> issues or claims that matters for purposes of the instant motions for preliminary

injunctions.  Rather, as two Judges of this Court (who reached opposite outcomes on similar

motions) have agreed, the likelihood of success analysis must focus on the legal basis for

petitioners to obtain orders preventing <u>termination</u> of detention by the United States in the

manner described in the declarations submitted herewith.  <u>See</u> <u>Al-Anazi</u>, 370 F. Supp. 2d at 194

("[T]he presence of a sound basis to challenge the legality of one's <u>detention</u> does not at all imply

that there exists a sound basis to challenge the legality of one's <u>transfer</u>.  Put differently, the

'merits,' if you will, to be assessed for purposes of the present claim for preliminary injunctive

relief, is petitioners' challenge to their <u>transfer</u> from Guantanamo, not to their <u>detention</u> at

Guantanamo (emphasis in original)); <u>Abdah</u>, 2005 WL 711814, at *4 ("<u>if</u> there are no

circumstances under which Petitioners could obtain a court order preventing a contemplated

transfer, a preliminary injunction should not be granted" (emphasis in original)).

 Ignoring these apt observations of two District Judges, however, petitioners still offer

nothing more in regard to likelihood of success on the merits than to speculate that each is "likely

to be successful in at least one of his numerous claims challenging <u>the</u> <u>fact</u> <u>of</u> <u>his</u> <u>detention</u>,"

Petrs' Mems. at 7 (emphasis added), the train of thought apparently being that if the claims are

numerous enough, surely one will stick.  Of course, this speculation has nothing to do with

whether "Petitioners could obtain a court order preventing a contemplated transfer," <u>Abdah</u>, 2005

WL 711814, at *4, and petitioners' motions are devoid of legal authority for such an order.  Even

if some legal basis for challenging a transfer existed, the Rule of Non-Inquiry, which bars judicial

inquiry into the fairness of a foreign nation's justice system and the procedures or treatment that

an individual may experience in a foreign nation, weighs heavily against petitioners' likelihood of

success in contesting a transfer or repatriation.

> **A.    No Valid Legal Basis Exists for a Judicial Order Enjoining Transfer or Repatriation of an Individual Previously Detained by the United States as an Enemy Combatant**

> **1.    Protection of the Court's Jurisdiction**

As discussed above in the context of irreparable harm, see supra Section II.A, protection of the Court's jurisdiction would not be an appropriate legal rationale for an order forbidding transfer or repatriation of an individual detained at Guantanamo, because relinquishment from United States custody (which occurs in every such transfer or repatriation) represents the full extent of relief that petitioners could obtain in habeas.  See Almurbati, 366 F. Supp. 2d at 80 ("[O]nce the respondents release the petitioners from United States custody . . . they will have obtained the result requested and at that point there will be no further need for this Court to maintain jurisdiction."); see also Al-Anazi, 370 F. Supp. 2d at 198.[10]  Indeed, as Judge Bates concluded, "[w]ere the Court to preserve its jurisdiction over the habeas petitions, and ultimately determine that the United States may no longer detain the petitioners, the parties and the Court would find themselves in precisely the same position in which they find themselves now – with the respondents taking steps to transfer those individuals out of United States control, and the

---

[10] One of the previous decisions on a similar motion in another Guantanamo detainee case criticized this proposition as "overly simplistic," because "[p]etitioner ultimately seeks total freedom from all custody, not just United States custody."  Al-Marri v. Bush, Civ. A. No. 04-2035 (GK), 2005 WL 774847, at *3 n.7 (D.D.C. Apr. 4, 2005).  Whatever petitioners may ultimately seek, however, a court of the United States clearly does not have jurisdiction to award a foreign national the relief of "freedom from all custody" worldwide, in the sense of immunity from detention in his home or a third country pursuant to its own domestic laws and independent determinations.  It is beyond cavil that the courts of the United States would have no authority to interfere with any decision a foreign sovereign nation may make to detain, investigate, or prosecute its own nationals being returned to it.

petitioners compelled to come forward with some legal or evidentiary basis to prevent transfer to

an 'undesirable' country." Al-Anazi, 370 F. Supp. 2d at 196. Thus, petitioners do not enjoy a

likelihood of success in obtaining order barring a transfer in order to "protect" the Court's

jurisdiction.

### 2. Federal Rule of Appellate Procedure 23(a)

Federal Rule of Appellate Procedure 23(a) does not provide a legal basis for enjoining the

type of transfer at issue (i.e., a transfer to a foreign government constituting a complete

relinquishment of custody by the United States), or for concluding that petitioners have a

likelihood of success on such claims. For one thing, that Rule by its terms does not apply in the

procedural posture of the instant petitions, in which no decisions exist that are on appeal. See

Fed. R. App. P. 23(a) (applying "[p]ending review of a decision in a habeas corpus proceeding"

and only to "the prisoner" in whose proceeding that decision was made); see also Fed. R. App. P.

1(a)(1) ("These rules govern procedure in the United States courts of appeals."); Order dated May

3, 2005, in Battayav v. Bush, Civ. A. No. 05-714 (RBW) (D.D.C.), at 1 n.1 (rejecting Fed. R.

App. P. 23(a) argument in case that, like these, did not have a pending appeal); see also Al-

Anazi, 370 F. Supp. 2d at 199 n.11 ("The Court notes that petitioners did not even attempt to

argue in their papers that Federal Rule of Appellate Procedure 23 requires a stay of a transfer

decision, because petitioners' habeas petition is not presently on appeal.").[11]

Even if Federal Rule of Appellate Procedure 23(a) could somehow be deemed to find

---

[11] The fact that now pending before the D.C. Circuit are habeas cases brought by other
Guantanamo detainees that raise identical issues does not somehow convert these cases into ones
that are somehow deemed constructively on appeal or otherwise governed by the Federal Rules
of Appellate Procedure.

application here notwithstanding the absence of any decisions in these cases that are on appeal,

that Rule simply does not apply to a situation, such as a repatriation, in which the United States

relinquishes custody of an individual altogether.  As Judge Bates recently ruled in another

Guantanamo detainee case, "[n]othing in the Rule indicates a desire to extend it to situations

where the United States (or a state) is transferring an individual out of federal or state custody

entirely." O.K. v. Bush, [377 F. Supp. 2d 102], 2005 WL 1621343, *12-*13 (D.D.C. July 12,

2005).  Rule 23(a) is designed to ensure that, in situations where a prisoner is transferred from

one custodian subject to federal habeas jurisdiction to another custodian subject to federal habeas

jurisdiction, but remains in the custody of the United States (or relevant state thereof), the court

is able to appropriately substitute the successor custodian as the respondent.  See Fed. R. App. P.

23(a) ("the court, justice, or judge rendering the decision under review may authorize the transfer

and substitute the successor custodian as a party"); Wood v. United States, 873 F. Supp. 56, 57

(W.D. Mich. 1995) (declining to adopt expansive construction of Rule 23(a) where "the purposes

of Rule 23(a) would not be furthered," which purposes are "reflected in the provisions of the rule

for substituting the successor custodian as a party").  Critically, nothing in Rule 23(a), nor any

other provision of law, operates to restrict the United States from relinquishing custody of an

individual, which, after all, is the ultimate object of a habeas corpus case.  See O.K., 2005 WL

1621343, at *12-*13; cf. Brady v. United States Parole Comm'n, 600 F.2d 234, 236 (9th Cir.

1979) (Rule "does not touch upon release" by government).

　　　In light of its focus on "substitut[ing] the successor custodian as a party," Fed. R. App.

Proc. 23(a), it does not make sense to read the Rule, as petitioners apparently do, to cover

situations that involve not a transfer from one United States custodian to another United States

custodian, but rather a relinquishment of United States custody altogether in connection with a transfer or repatriation to a foreign nation.  In that situation, there is no "successor custodian" subject to federal habeas jurisdiction who could be substituted as a party.[12]  See O.K., 2005 WL 1621343, at *13 (noting that petitioners' interpretation of the word "another" to include a foreign government "immediately runs into difficulty in the next sentence of the Rule").  Moreover, upon relinquishment of United States custody, the relief available in habeas would have been received and the habeas case therefore would be moot, making substitution of a successor custodian unnecessary.

Indeed,  until the recent decision in Abdah, 2005 WL 711814, our research has not uncovered a single case where Federal Rule of Appellate Procedure 23(a) has been held to apply to the transfer of a detainee to a foreign country and concomitant relinquishment of custody by the United States, even assuming arguendo that petitioner could be considered a "prisoner" within the meaning of the Rule.  To the contrary, Rule 23(a) cases have universally involved transfers from one United States (or state) custodian to another United States (or state) custodian where the prisoner remained in the custody of the United States (or state authorities).  See, e.g., Goodman v. Keohane, 663 F.2d 1044, 1047 (11th Cir. 1981) (involving transfer from federal correctional facility in Miami, Florida to a federal penitentiary in Terre Haute, Indiana); see also Brady, 600 F.2d at 236 (Rule 23 "was promulgated to alleviate jurisdictional problems

---

[12] This is so regardless of whether the foreign nation to which the former Guantanamo detainee is repatriated or transferred may itself detain the individual as a function of its own law enforcement, criminal justice, or other interests, as is its prerogative.

sometimes created by geographical limits on habeas corpus jurisdiction").[13]  As Judge Bates held,

in light of the "well-settled canon of statutory interpretation providing that a court should not

construe a statute to interfere with the province of the Executive over military affairs in the

absence of a clear manifestation of Congressional intent to do so," these cases involving

detainees captured in the course of ongoing military hostilities do not present an appropriate

occasion for indulging a creative interpretation that "would transform a technical and procedural

rule that addresses the identity of the parties in a habeas proceeding into a sweeping prohibition

on the transfer and release of military detainees while a case is on appeal." O.K., 2005 WL

1621343, at *13 (citing Dep't of Navy v. Egan, 484 U.S. 518, 527 (1988)).

### 3.    International Treaties

Some detainee-petitioners in these cases have claimed, although no Judges to date have

adopted as a basis for ordering relief, that any transfer or repatriation would violate certain

international treaties such as the Geneva Conventions.  These claims are not valid and do not

provide a basis for finding a likelihood of success in obtaining an order barring a transfer or

---

[13]  That Rule 23(a) does not cover a transfer or repatriation resulting in an individual being released from United States custody is underscored by the Supreme Court's handling of the issue in Rasul v. Bush, 124 S. Ct. 2686 (2004).  While Rasul was pending, the United States transferred two named petitioners therein to the custody of the United Kingdom.  See Press Release dated Mar. 9, 2004, at <<http://www.defenselink.mil/releases/2004 /nr20040309-0443.html>> ("The Department of Defense announced today that it transferred five British detainees from Guantanamo Bay, Cuba, to the British government today.").  As Judge Bates noted, see O.K., 2005 WL 1621343, at *13, even though the Supreme Court has a rule virtually identical to Rule 23(a), the Court did not give any hint of perceiving any violation of its rule.  Instead, it simply noted the transfers and moved on to consider the claims of the petitioners who remained before the Court.  See Rasul, 124 S. Ct. at 2690 n.1.  The notable absence of any suggestion that Supreme Court Rule 36 came into play in these circumstances strongly militates against construing the identically worded Federal Rule of Appellate Procedure to cover the same situation.

repatriation.  On July 15, 2005, the D.C. Circuit issued its opinion in another Guantanamo

detainee case holding squarely that "the 1949 Geneva Convention does not confer upon [a

detainee] a right to enforce its provisions in court."  Hamdan v. Rumsfeld, [415 F.3d 33], 2005

WL 1653046, *6 (D.C. Cir. July 15, 2005).  In any event, neither these petitioners nor any others

have identified any provision in any treaty that is in conflict with the United States' policy

governing transfers and repatriations of individuals detained at Guantanamo by the Department

of Defense, or that would be violated by a transfer or repatriation undertaken in accordance with

that policy.[14]

**B.     Separation-of-Powers Principles Militate Heavily Against
         Petitioners' Likelihood of Success**

Further, even if some valid claim or other legal basis existed for judicial involvement in

transfer or repatriation decisions with respect to enemy combatants held abroad, or for an

advance notice requirement to support and facilitate such involvement, the separation of powers

would bar such relief.  "[I]t is beyond the judicial function for a court to review foreign policy

decisions of the Executive Branch."  People's Mojahedin Org. v. Dep't of State, 182 F.3d 17, 23

(D.C. Cir. 1999) (citing Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333

---

[14] Some petitioners, though not those presently before the Court, have cited the
International Covenant on Civil and Political Rights ("ICCPR") and the Convention Against
Torture and Other Cruel and Degrading Treatment and Punishment ("CAT") as legal bases for an
order requiring advance notice of a transfer.  However, no Judge has adopted those arguments,
and, indeed, numerous courts have held, just as the D.C. Circuit has now held with respect to the
Geneva Conventions, that those treaties do not give rise to judicially enforceable rights.  See,
e.g., Sosa  v. Alvarez-Machain, 124 S. Ct. 2739, 2767 (2004) (ICCPR); In re Guantanamo
Detainee Cases, 355 F. Supp. 2d 443, 480 (D.D.C. 2005) (ICCPR); Khalid v. Bush, 355 F. Supp.
2d 311, 327 (D.D.C. 2005) (ICCPR and CAT); see also Al-Anazi, 370 F. Supp. 2d at 194
(rejecting petitioners' argument that Foreign Affairs Reform and Restructuring Act of 1998,
which implemented CAT in certain immigration-specific contexts, could serve as legal basis for
prohibiting or limiting transfer of wartime detainees to other countries).

U.S. 103 (1948)); see also Holmes v. Laird, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations

such as this, '[t]he controlling considerations are the interacting interests of the United States and

of foreign countries, and in assessing them [the courts] must move with the circumspection

appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our

international relations.'") (quoting Romero v. International Terminal Operating Co., 358 U.S.

354, 383 (1959)).[15]  If the Court were to entertain petitioners' claims to a right to contest

repatriation or removal from Guantanamo, it would insert itself into the most sensitive of

diplomatic matters.  Judicial review of a transfer or repatriation decision could involve scrutiny

of United States officials' judgments and assessments on the likelihood of torture in a foreign

country, including judgments on the reliability of information and representations or the

adequacy of assurances provided, and confidential communications with the foreign government

and/or sources therein.  Prosper Decl. ¶¶ 9-12.  Disclosure and/or judicial review of such matters

could chill important sources of information and interfere with our ability to interact effectively

with foreign governments.  Prosper Decl. ¶¶ 9-12; Waxman Decl. ¶ 8.  In particular, the foreign

government in question, as well as other governments, would likely be reluctant to communicate

frankly with the United States in the future concerning torture and mistreatment concerns.

Prosper Decl. ¶¶ 10, 12.  This chilling effect would jeopardize the cooperation of other nations in

---

[15] In Holmes, U.S. citizen servicemembers sued to prevent the United States government from surrendering them to West German authorities to serve sentences for convictions by West German courts on criminal charges relating to their conduct while stationed in West Germany. Even in this situation involving U.S. citizens, the District Court and D.C. Circuit rejected the plaintiffs' invitation to examine the fairness of their treatment by the West German courts and declined to enjoin the transfer, the latter court holding that "the contemplated surrender of appellants to the Federal Republic of Germany is a matter beyond the purview of this court."  459 F.2d at 1225.

the war on terrorism.  Prosper Decl. ¶¶ 10, 12; Waxman Decl. ¶ 8.

Because of these foreign relations implications, as developed most extensively in the

analogous context of extradition, courts have uniformly eschewed inquiry into "'the fairness of a

requesting nation's justice system'" and "'the procedures or treatment which await a surrendered

fugitive in the requesting country.'"  United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir.

1997) (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983));

see Al-Anazi, 370 F. Supp. 2d at 194 (holding that this "well-established line of cases in the

extradition context" "counsel[s] even further against judicial interference").  This principle is

sometimes called the Rule of Non-Inquiry.  For example, in Ahmad v. Wigen, 910 F.2d 1063 (2d

Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial

for an alleged terrorist attack.  While the district court upheld the extradition only after receiving

testimony and extensive documentation concerning Israel's law enforcement system and

treatment of prisoners, the Second Circuit held that such inquiry was wholly improper.  "The

interests of international comity are ill-served," the Second Circuit explained, "by requiring a

foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its

laws and the manner in which they are enforced."  Id. at 1067.  "It is the function of the Secretary

of State to determine whether extradition should be denied on humanitarian grounds."  Id.

Accord Escobedo v. United States, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar

extradition based on allegations that appellant "may be tortured or killed if surrendered to

Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that

properly falls within the exclusive purview of the executive branch" (internal quotation marks

omitted)); Peroff v. Hylton, 563 F.2d 1099, 1102 (4th Cir. 1977); Matter of Extradition of

21

Sandhu, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993); Hoxha v. Levi, No. Civ. A. 05-1211, 2005 WL 1244913, *6-*7 (E.D. Pa. May 25, 2005) (holding that allegations that individual would be tortured after extradition to Albania were solely for the Secretary of State to weigh, and not an appropriate subject for judicial inquiry). See generally Jacques Semmelman, Federal Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings, 76 Cornell L. Rev. 1198 (1991).[16]

The force of these principles is not diminished by the fact that petitioners seek judicial review of any kind of transfer, repatriation or removal from Guantanamo, rather than merely trying to block an extradition. The considerations that underlie the Rule of Non-Inquiry are not endemic to the specific context of extradition, but instead rest on the constitutional separation of powers.[17] See Matter of Requested Extradition of Smyth, 61 F.3d 711, 714 (9th Cir. 1995)

---

[16] In Cornejo-Barreto v. Seifert, 218 F.3d 1004 (9th Cir. 2000), two Judges on a panel of the Ninth Circuit stated in dicta that a permanent resident within the United States facing extradition could seek judicial review of his claim that he would be tortured if extradited. But see id. at 1017 (Kozinski, J., concurring) (not joining this part of the panel opinion). However, in a later appeal growing out of the same case, another panel of the Ninth Circuit disagreed with that statement, recognizing it as dicta, and held, consistent with previous Ninth Circuit precedent, Lopez-Smith v. Hood, 121 F.3d 1322 (9th Cir. 1997), that the Rule of Non-Inquiry barred judicial review of such a claim. Cornejo-Barreto v. Seifert, 379 F.3d 1057 (9th Cir. 2004). While that appeal was still pending (the Ninth Circuit having granted rehearing en banc), the case became moot when the foreign government seeking extradition withdrew its request. Accordingly, the Ninth Circuit dismissed the appeal, vacating as moot the 2004 panel opinion and the district court opinion it reviewed. Cornejo-Barreto v. Seifert, 389 F.3d 1307 (9th Cir. 2004).

[17] Some petitioners in Guantanamo detainee habeas cases have argued that the Rule of Non-Inquiry is contingent on the existence of an extradition treaty, citing In re Extradition of Howard, 996 F.2d 1320, 1329 (1st Cir. 1993). However, the applicable language from Howard was characterized as dicta by the First Circuit in a subsequent decision. Kin-Hong, 110 F.3d at 111 n.12. In that later case, while pretermitting the question "[w]hether the doctrine is constitutionally mandated" as "immaterial here," the First Circuit cited an analogy to the act-of-

(continued...)

("Undergirding this principle is the notion that courts are ill-equipped as institutions and ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and pronouncements about the workings of foreign countries' justice systems."); Sandhu, 886 F. Supp. at 321 ("The rule of non-inquiry arises from recognition that the executive branch has exclusive jurisdiction over the country's foreign affairs."); cf. Holmes, 459 F.2d at 1219-23 (holding, in a non-extradition context, that considerations similar to those embodied in the Rule of Non-Inquiry made it improper for the Judiciary to examine allegations of unfairness in a foreign nation's trial of a U.S. citizen). Thus, petitioners cannot turn to the courts to second-guess Executive judgments about matters such as custodial conditions and/or the adequacy of legal procedures in a foreign country as well as the credibility and adequacy of a foreign government's assurances. Cf. People's Mojahedin, 182 F.3d at 23 (expressing reluctance of courts to interfere in matters "'for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to

---

[17](...continued)
state doctrine and described the doctrine using language imbued with constitutional significance. See id. at 110-11 ("The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers. It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.") (citation omitted).

Moreover, to the extent that petitioners may contend that the only possible way to repatriate them would be pursuant to an extradition treaty or statute, such a contention would be wholly without merit. See United States v. Alvarez-Machain, 504 U.S. 655 (1992); Ker v. Illinois, 119 U.S. 436 (1886); Coumou v. United States, 107 F.3d 290, 295 (5th Cir. 1997) (reversing lower court's holding, 1995 WL 2292, *11 (E.D. La. Jan. 3, 1995), that "[n]or did the United States, or its officers or agents, have the discretion to deliver an arrested person to the government of Haiti, unless the extradition laws of the United States were followed").

judicial intrusion or inquiry'" (quoting <u>Chicago & Southern</u>, 333 U.S. at 111)).

***

Thus, there is no basis in law for an injunction requiring advance notice of an upcoming transfer or repatriation in order to enable petitioners to seek a judicial order blocking it.  Neither the Court's habeas corpus jurisdiction nor Federal Rule of Appellate Procedure 23(a) support the notion of ordering custody that the United States wishes to relinquish to nevertheless be artificially and indeterminately prolonged purely to preserve a live case for the Court.  And, apart from the absence of affirmative legal authority, separation of powers considerations and foreign relations sensitivities preclude a judicial inquiry in which this Court would substitute its judgment regarding the appropriateness of repatriation for that of the appropriate Executive Branch officials.

**IV.    AN INJUNCTION REQUIRING ADVANCE NOTICE
        WOULD TRAMPLE ON THE SEPARATION OF POWERS**

It is undisputed that the sole reason petitioners seek advance notice is to enable them to seek an order blocking a transfer or repatriation decision that the Executive would already have made after consultation and coordination with the foreign government in question.  <u>See</u> Petrs' Mems. at 6-7 (purpose of advance notice would be to give petitioners "a meaningful opportunity to contest his transfer").  Such an advance notice requirement foreshadows judicial review and intervention that would be accompanied by the attendant harms discussed in the declarations of Deputy Assistant Secretary Waxman and Ambassador Prosper submitted herewith.  <u>See</u> Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12.  Even if such judicial review did not ultimately result in an injunction against transfer, the mere inquiry into the United States' dialogue with foreign nations

and into the terms of a transfer and any assurances that may have been obtained would cause grave harm.  See supra Section III.B (describing interests of international comity that underlie the Rule of Non-Inquiry); Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12.  Moreover, the very prospect of judicial review, as exemplified by an advance notice requirement, causes separation-of-powers harm by undermining the ability of the Executive Branch to speak with one voice in its dealings with foreign nations.  See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments").  An advance notice requirement, after all, would make the results of diplomatic dialogue between the Executive Branch and a foreign government regarding repatriations or transfers inherently contingent because the effective acquiescence of another Branch (i.e., the Judiciary) would be required for a transfer or repatriation to go forward, and such a requirement would also inject delays into future transfers.  These harms weigh heavily against entry of a preliminary injunction.

## V.    AN INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST

The public interest favors allowing the Executive Branch, which is constitutionally vested with the authority both to conduct military functions, such as detention of enemy combatants for the duration of hostilities, and to engage in foreign relations, to act without undue intrusion within its constitutional sphere of responsibility.  Petitioners undoubtedly will invoke truisms such as that the public interest disfavors torture, but that aspect of the public interest is already well served by the existing policies and processes governing transfers and repatriations of

Guantanamo detainees, as described in the accompanying declarations.[18]  As Judge Bates held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon the foreign policy and war powers of the Executive on a deficient factual record. Where the conduct of the Executive conforms to law, there is simply no benefit – and quite a bit of detriment – to the public interest from the Court nonetheless assuming for itself the role of a guardian ad litem for the disposition of these detainees.  See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch.").

Al-Anazi, 370 F. Supp. 2d at 199.  Here, as well, the public interest disfavors an injunction.

### CONCLUSION

For the reasons stated above, respondents respectfully request that petitioners' motions for preliminary injunctions be denied.

Dated: August 22, 2005                    Respectfully submitted,

                                          PETER D. KEISLER
                                          Assistant Attorney General

                                          KENNETH L. WAINSTEIN
                                          United States Attorney

                                          DOUGLAS N. LETTER
                                          Terrorism Litigation Counsel

---

[18] Similarly, while two Judges, in granting preliminary injunctions, have relied on the general statement that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," G&V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994), cited in Al-Marri, 2005 WL 774847, at *6; Abdah, 2005 WL 711814, at *6, that formulation merely begs the question what violations of constitutional rights (assuming arguendo that enemy aliens detained at Guantanamo possess rights under the United States Constitution, but see Khalid v. Bush, 355 F. Supp. 2d 311, 320-23 (D.D.C. 2005)) are present or imminent here and stand to be prevented by an injunction.  As discussed above, respondents' policy and practices governing transfer and repatriation of Guantanamo detainees plainly do not violate any rights petitioners may have, constitutional or otherwise.  The public interest surely does not support assuming without any foundation that Executive Branch officials are wont to engage in constitutional violations unless supervised by the courts.

_/s/ Robert J. Katerberg_
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ
PREEYA M. NORONHA
ROBERT J. KATERBERG
ANDREW I. WARDEN
NICHOLAS J. PATTERSON
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-4107
Fax:  (202) 616-8470

Attorneys for Respondents