IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HUSSAIN SALEM MOHAMMED ALMERFEDI, *et al.*,<br>Petitioners,<br><br>*v.*<br><br>GEORGE W. BUSH, *et al.*,<br>Respondents. | )<br>)<br>)<br>)<br>)<br>)   05-CV-1645 (PLF)<br>)<br>)<br>)<br>)<br>)<br>) |

PETITIONERS' OPPOSITION TO RESPONDENTS' MOTION
TO EXAMINE PRIVILEGED COMMUNICATIONS SEIZED
WITHOUT NOTICE OR APPROVAL

Respondents have, by their own admission, confiscated material marked as subject to the attorney-client privilege from all non-enemy combatant Guantanamo detainees. Despite a court-approved comprehensive system for handling attorney-client communications, the government seized attorney-client materials on the pretext of investigating three detainee suicides. Before engaging in a wholesale invasion of the privilege, the government failed to seek this Court's permission to do so and waited nearly a month to inform the Court and counsel of its activities. The government seeks to legitimate its unauthorized seizure and establish a procedure whereby the government itself will review the content of the privileged communications. Its motion should be denied. Moreover, the government should show cause why it should not be held in contempt for violating the mechanism established by this Court in the Revised

1

Procedures for Counsel Access to Detainees at the U.S. Naval Base in Guantanamo Bay, Cuba ("Access Procedures").

This Court, in managing the Guantanamo detainee cases, struck a careful balance between respecting national security interests and allowing counsel to have access to their clients. The Access Procedures reflect that balance. Sensitive to national security imperatives, the Access Procedures nonetheless recognize the existence of the attorney-client privilege at Guantanamo. Legal mail sent to detainees is inspected for contraband (non-paper items) but is not read by the Privilege Team, which was established by the Court. Access Procedures, § IV(A). Information that counsel learns from a detainee, including information reflected in counsel's interview notes, is presumptively classified but is only submitted to the privilege team for a review of its content if counsel wishes to have it declassified. Id., §§ IV, VI. The Guantanamo Commander can review materials given to a detainee, but only when they are brought into a meeting with the detainee and only to determine that they don't threaten US national security interests. Id., § V. Telephone conversations between detainees and counsel, though rarely approved, are not to be monitored or recorded. Id., § VIII.

The government has now changed the rules of the game by confiscating privileged materials unilaterally and without notice and subjecting their contents to government review. Respondents' Motion for Procedures Related to Review of Certain Detainee Materials ("Resp. Mot.") at 7 (a NCIS investigator viewed the contents of an envelope marked as containing attorney-client privileged material). This Court should order the government to show cause why it should not be sanctioned for seizing and reviewing the prisoners' legal papers without prior approval of the Court and notice to

2

counsel, and for failing to report its actions to the Court and counsel until nearly a month after the fact.

## ARGUMENT

**I.   THE GOVERNMENT'S SEIZURE AND EXAMINATION OF PETITIONERS' LEGAL PAPERS WAS UNLAWFUL**

### A.   The Prisoners' Legal Papers May Not Be Seized and Reviewed Without An Individualized Showing of Probable Cause

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Despite the government's contrary claim, the privilege has Constitutional significance, given that it is key to the constitutional guarantees of the right to effective assistance of counsel and a fair trial. *Coplon v. United States,* 191 F.2d 749, 757 (D.C. Cir. 1951). Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998); *see also Lanza v. State of New York*, 370 U.S. 139, 143-44 (1962) ("[I]t may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection."). As this Court has recognized in the context of the Guantánamo litigation, "[t]he privilege that attaches to communications between counsel and client has long held an exceptional place in the legal system of the United States." *Al Odah*, 346 F. Supp. 2d 1, 10 (D.D.C. 2004).

The Supreme Court's recent decision in *Hamdan v. Rumsfeld* also requires that the attorney-client relationship be respected. *Hamdan* held that Common Article 3 of the

Geneva Conventions sets minimum standards for detainee treatment.[1] 2006 U.S. LEXIS 5185 at \*\*124-25 (2006). The Court held that the Common Article 3 and the Uniform Code of Military Justice (UCMJ) require that detainees receive procedural protections equivalent to those of U.S. courts-martial, at least in the absence of a showing of necessity by the government, which has not been made here. Id. at \*116-17. The United States Manual for Courts-Martial provides that a client has the privilege of maintaining confidential communications between himself and his attorney for the purposes of legal representation. Manual for Courts-Martial, Rule 502(a) (2005) ("Lawyer-client privilege"). No exception to that privilege is applicable here. Id., Rule 502(d). Thus, it would be inconsistent with international law, the UCMJ, and the Supreme Court's ruling in *Hamdan* for the government to be permitted to invade the lawyer-client privilege – on its own initiative – by confiscating and reading confidential lawyer-client communications.

Nowhere is the effectuation of the privilege more important than in the context of pre-trial detention. "An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to redress his grievances is particularly important." *Bach v. Illinois*, 504 F.2d 1100, 1102 (7th Cir. 1974); *see also Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pretrial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials. When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised."). For such prisoners,

---

[1] According to Article 3, "the passing of sentences...without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples" is prohibited. Fourth Geneva Convention Relative to the Treatment of Prisoners of War, Common Art. 3(1)(d).

4

"contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts." *Bach*, 504 F.2d at 1102. Even for prisoners convicted of crimes, the Supreme Court has held, "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right to access to the courts are invalid." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974).

Seizure of legal papers is particularly egregious because it strikes at the heart of the attorney-client relationship and interferes with the inmate's access to the courts. "The taking of legal papers will often (though perhaps not always) interfere with an inmate's right of access to the courts. . . . [T]he destruction or withholding of inmates' legal papers burdens a constitutional right, and can only be justified if it is reasonably related to a legitimate penological interest." *Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997) (internal citations omitted); *see also Simmons v. Dickhaut*, 804 F.2d 182, 183–84 (1st Cir. 1986); *Wright v. Newsome*, 795 F.2d 964, 968; *Carter v. Hutto*, 781 F.2d 1028, 1031–32 (4th Cir. 1986); *Hiney v. Wilson*, 520 F.2d 589, 591 (2d Cir. 1975).

The government's vague allegations of notes found in a dead prisoners' cell written by another prisoner cannot qualify as a "legitimate penological interest" in seizing *all* legal documents from *all* prisoners. As this Court held in *Al Odah*, because detainees are entitled to be represented by counsel, "the government is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communications between them." 346 F. Supp. 2d at 5.

Abrogation of the attorney-client privilege in any context requires the government to make a specific, *individualized* showing that there is sufficiently compelling

5

justification for invading the privilege. For example, where the government invokes the crime-fraud exception to the attorney-client privilege, it bears the burden of making an adequate showing that the exception applies – i.e., that *that* client "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and actually carried out that act. *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997); *see also Doe v. United States*, 2003 WL 22879314 (2d Cir. Dec. 4, 2003) (reversing contempt order where government failed to meet burden of showing that crime-fraud exception applied); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (requiring a showing of probable cause to believe that a crime or fraud has been attempted or committed and that attorney-client communications were used to further that crime or fraud); *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden of showing that the crime-fraud exception applied to the documents the corporation failed to produce). Similarly, when the government seizes materials from a location that likely contains privileged papers, that seizure must be supported by probable cause and a warrant, and it still must employ appropriate means of screening out privileged materials. *See, e.g., United States v. Stewart*, 2002 WL 1300059 (S.D.N.Y. June 11, 2002).

The government has not cited any cases that suggest the privilege may be invaded without an *individualized*, sufficiently rigorous showing that that materials of a particular client or particular attorney are likely to have been abused in furtherance of a crime. *See, e.g.*, *United States v. Skeddle*, 989 F. Supp. 890, 894 (N.D. Ohio 1997) (permitting review of attorney-client materials "[i]n light of the finding of probable cause that had preceded the issuance and execution of the warrant"); *United States v. Grant*, No. 04 CR

6

207, 2004 WL 1171258, at *2 (S.D.N.Y. Dec. 14, 1982) (documents "seized pursuant to a valid warrant, which was based upon a [judicial] finding of probable cause"). Even when such documents will be reviewed *in camera* by the court – and not by the government – "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572 (quotations and citations omitted).

The government argues that the attorney-client privilege "is not inviolable" and is must defer to countervailing public policy interests. Resp. Mot. at 15. The government cites no case which endorses the mass invasion of prisoners' attorney-client privilege in order to advance the countervailing interest of investigating prison suicides. The cases respondents cite involve limited and specific circumstances relating to criminal investigations and the enforcement of criminal laws. *United States v. Jones*, 696 F.2d 1069 (4th Cir. 1982); *United States v. Grant*, 2004 WL 1171258 (S.D.N.Y. May 25, 2004); *United States v. Stewart*, 2002 WL 1300059 (S.D.N.Y. Jan. 11, 2002); *United States v. Golberger & Dubin, P.C.*, 935 F.2d 501 (2d Cir. 1991) and *United States v. Skeddle*, 989 F. Supp. 890 (N.D. Ohio 1997). In contrast, the NCIS investigation is not a criminal one[2] and no such countervailing particularized interest exists here.

The government further contends that the Access Procedures empower it to limit the attorney-client privilege unilaterally. Resp. Mot. at 16. This is an incorrect interpretation of those procedures. First, the government argues that § 1 of the Access Procedures limits the privilege to those communications made "for purposes of litigating

---

[2] The NCIS investigation, by its terms of reference, relates only to the circumstances and cause of the three detainee suicides. Resp. Motion at 4; Harris Decl. ¶ 2; Kisthardt Decl. ¶ 2.

7

these cases." Id. That phrase, however, does not apply to the scope of the privilege, but rather to the scope of counsel's "access to detainees" at Guantanamo. Access Procedures, § 1. Further, the attorney client privilege belongs to the client, not the attorney, and so a measure restricting counsel access, even if it did apply to a communication, would in no way diminish that privilege. See, *Goldberger & Dubin, P.C.*, 935 F.2d 501, 504; Manual for Courts-Martial, Rule 502(a). The government's second argument is that the Access Procedures permit the Privilege Team to disclose and require counsel to disclose any information learned from detainees involving imminent violence or future threats to national security. Resp. Mot. at 16. This is a far cry from authorizing the government to confiscate materials marked as attorney-client confidential, read them for content, and possibly report what it considers to be misuse of the privilege. The Access Procedures empower the government, via the Privilege Team, to review materials submitted to it by counsel, not to actively seek out materials (let alone *all* materials from *all* detainees) and determine whether or not the privilege should apply.

**B.     The Government Has Made No Such Individualized Showing**

Petitioner does not challenge the right of the government to investigate the detainee suicides. However, petitioner objects to the government's asserted ability to confiscate attorney-client materials in the absence of a particularized showing that he was involved in the planning or cover-up of the suicides. Nothing in the government's motion, save the caption itself, relates in any way to the petitioner. Nor could it: counsel have just recently received security clearance and have yet to have had privileged communications with petitioner. Petitioner, therefore, has no attorney-client communications that could have been misused.

8

The respondents claim that attorney-client materials were being misused by Guantanamo detainees in general. Even assuming that this would justify the widespread invasion of the attorney-client privilege, the evidence the government offers does not support its premise that materials were being misused. The initial documents cited by the government were found either in the possession of one of the deceased detainees or were written by one of the deceased. The additional documents are telling in what they reveal – not a single inappropriate document was found in an attorney-client envelope.

First, the document labeled "FOUO" is a red herring. "FOUO" or "For Official Use Only" stamps are *not* classification designations; documents so-labeled are not necessarily sensitive in any manner. "FOUO" is nothing but an internal Department of Defense designation whose purpose is to determine whether a particular document may be released to the public under the Freedom of Information Act. "The abbreviation 'FOUO' is used to designate *unclassified* portions that contain information that may be exempt from mandatory release to the public under [FOIA] . . . ." DoD Regulation 5200.1: C5.2.7.1.1.3 (emphasis added). The designation "is, by definition, unclassified." *Id.* AP3.2.2.3.2. The Protective Order does not prevent prisoners from being in possession of FOUO documents; such documents by definition represent no security risks, and there is therefore no reason why a prisoner should not legitimately be in possession of them.

Second, the document that is marked with a crossed-out "SECRET" stamp is surely *not* a classified document and therefore should be of no concern to NCIS investigators. (The government, of course, has failed to provide counsel with copies of the documents it relies upon for the instant motion, so counsel can only make an educated

9

guess about the nature of the formerly "SECRET" document.)  Based on counsel's experience with handling the documents in these cases, it seems quite likely that the document was *once* classified and that – whether by request of counsel or the media, or *sua sponte* by the government – the document was declassified and marked accordingly.  It is typical for such documents to have the original "SECRET" stamp crossed out and "Unclassified" written beside it.  The Protective Order does not prevent prisoners at Guantánamo from possessing unclassified documents, and there is therefore no reason why a prisoner should not legitimately be in possession of such documents.

Third, the so-called "knot-tying" document found by the government is not purported to have been labeled "attorney-client material" and is not alleged to have been discovered in a prisoner's privileged legal folder.  (Again, counsel have not seen the document and have no way even to know whether the government's characterization of this document is fair.)  The document therefore appears to have no relevance to the instant motion, which after all seeks review only of privileged items that have been confiscated by government agents.

Fourth, an apparent suicide note that was handwritten on the back of a piece of paper marked "attorney-client privileged" was quite obviously not being "hidden" by any of the prisoners.  The piece of paper was discovered in the mesh of the cell wall of one of the deceased, not secreted in the privilege folder of any of the prisoners.  If the deceased were seeking to keep this document from the prying eyes of the prison guards by disguising it as a privileged document, why did he place in the open where it would inevitably be discovered?  The purpose of a suicide note is to be read.  Thus it must be inferred that the prisoner in fact wanted the note to be discovered and that he drafted it on

10

the only piece of paper readily available to him.  In all likelihood, the only "abuse" of the privilege system was one prisoner's agreement to provide the deceased with a piece of paper from his privilege folder in order to allow him to express his last wishes to his family.

Finally, the government does alert counsel and the Court to a single document that – from the government's description of it, anyway – likely should not have been in the possession of a prisoner.  Remarkably, however, the document is an *email from JTF-Guantánamo itself* – a document that obviously was not provided to a prisoner by counsel, since counsel does not have access to such documents.

## II. THE COURT SHOULD REJECT THE GOVERNMENT'S PROPOSAL TO CREATE A FILTER TEAM

The attorney-client privilege is possessed by the client, not the attorney.  See, *Goldberger & Dubin, P.C.*, 935 F.2d at 504; Manual for Courts-Martial, Rule 502(a).  Petitioner's habeas counsel, therefore, cannot consent to the abrogation or waiver of that privilege in the absence of the consent of the petitioner.  No such consent was given here, nor would it be feasible to obtain such consent given the difficulty in gaining client access at Guantanamo.  Consequently, the *only* acceptable resolution of this conflict is for the government to immediately return any privileged materials to the detainees and abdicate its overbroad investigation.[3]

---

[3] It should be noted that the government's proposed "Filter Team" would enable the government to police petitioner's attorney-client materials for purported misuse of those materials. Resp. Mot. at 11, n.10. Respondents cite no precedent for this monitoring and this Court long ago reminded the government that "the government's decision to grant an individual attorney a security clearance amounts to a determination that the attorney can be trusted with information at that level of clearance." *Al Odah*, 346 F. Supp. 2d at 14.

III.  **PETITIONER'S CASE SHOULD NOT BE CONSOLIDATED WITH THOSE OF OTHER GUANTANAMO DETAINEES FOR THE PURPOSES OF ADJUDICATING THE ISSUES RAISED HEREIN**

Adjudication of the issues presented herein require individualized determinations in light of the facts of each detainee's case. Specifically, it requires the court to examine the government's blanket claims in light of the evidence that each detainee misused privileged materials. With respect to the petitioner, the government presents no such particularized evidence. Permitting consolidation, then, would presuppose that which the petitioner here denies: that the government has some factual basis for including him in its rampant invasion of the attorney-client privilege.

IV.  **CONCLUSION**

The government's motion to examine privileged communications should be denied.

Date:  July 19, 2006

                                          Respectfully Submitted,

                                          /s/
                                       _____

Judith Brown Chomsky
LAW OFFICES OF JUDITH BROWN CHOMSKY
P.O. Box 29726
Elkins Park, PA 19027
(215) 782-8367 (ph)
(215) 782-8368 (fx)

Attorney for Petitioner

12