FILED WITH THE
COURT SECURITY OFFICER
CSO: M Query RSU
DATE: 7 / 8 / 10

~~SECRET // NOFORN~~

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HUSSAIN SALEM MOHAMMAD ALMERFEDI, ) ) ) ) Petitioner, ) ) v. ) BARACK OBAMA, ) President of the United States, *et al.*, ) ) Respondents, ) ) | Civil Action No. 05-1645 (PLF) |

### CLASSIFIED OPINION

Petitioner Hussain Salem Mohammad Almerfedi has been in the custody of the

United States since 2002, and has been held at the Guantanamo Bay Naval Base in Cuba since

2003. He has filed a petition for a writ of *habeas corpus*, by which he challenges the legality of

his detention and asks the Court to order him released. The government asserts that it has the

authority to detain petitioner pursuant to the Authorization for the Use of Military Force, Pub. L.

No. 107-40, 115 Stat. 224 (2001), because: (1) while staying at al Qaeda guesthouses in Iran,

petitioner acted as an al Qaeda facilitator helping foreign fighters infiltrate Afghanistan;

(2) ███████████████████████████████████████████████████

(3) petitioner actively associated with Jama'at al-Tablighi, an Islamic missionary organization, at

the same time this organization provided logistical support and operational coverage to terrorist

organizations and foreign fighters fleeing Afghanistan. Petitioner denies that he had any

~~SECRET // NOFORN~~

SECRET // NOFORN

association with al Qaeda or other terrorist groups and maintains that his association with Jama'at al-Tablighi was innocent.

In order to determine whether petitioner's detention is lawful, the Court has carefully considered the documents admitted in evidence, the extensive legal briefs submitted by the parties, and the arguments presented by counsel at the three day Merits Hearing held on March 3, 4 and 5, 2010. At the beginning of the Merits Hearing, petitioner listened by telephone to the unclassified opening statements presented by his counsel and by government counsel. Thereafter, the proceedings were closed. Counsel presented no witnesses at the Merits Hearing, but relied exclusively on documentary evidence and the inferences they asked the Court to draw from the evidence. Based on the evidence and the arguments presented, the Court finds that the government has not met its burden to show by a preponderance of the evidence that it has legal authority to detain the petitioner. Accordingly, the Court will grant the petition for *habeas corpus*.

## I. BACKGROUND

### *A. Procedural History*

Petitioner filed his petition for a writ of *habeas corpus* on August 16, 2005. Shortly thereafter, this case was stayed pending resolution of the question whether this Court has jurisdiction over *habeas* petitions filed by Guantanamo detainees. After extensive litigation regarding these *habeas* petitions, the Supreme Court's 2008 decision in Boumediene v. Bush finally made clear that this Court does have jurisdiction to consider *habeas* petitions from detainees held at Guantanamo Bay, and advised the judges of the Court that "[t]he detainees in

SECRET // NOFORN

2

SECRET//NOFORN

these cases are entitled to a prompt *habeas corpus* hearing." Boumediene v. Bush, 553 U.S. 723, __, 128 S. Ct. 2229, 2275 (2008). Following the Boudmediene decision, the undersigned and most of the other judges of this Court agreed to consolidate their Guantanamo Bay *habeas* cases before former Chief Judge Thomas F. Hogan for coordination and management. Judge Hogan issued numerous invaluable decisions that established a procedural framework for these unique cases. The individual judges retained the cases for resolution of the merits of the *habeas* petitions.

Decisions of the Supreme Court and the D.C. Circuit have made plain that the government bears the burden of establishing that a Guantanamo detainee's detention is lawful, and it must do so by a preponderance of the evidence. See Boumediene v. Bush, 553 U.S. at __, 128 S. Ct. at 2229; Awad v. Obama, No. 09-5351, slip op. at 18 (D.C. Cir. June 2, 2010); Al-Bihani v. Obama, 590 F.3d 866, 878 (D.C. Cir. 2010); see also In re Guantanamo Bay Detainee Litig., Misc. No. 08-0442, CMO § II.A, 2008 WL 4858241 (D.D.C. Nov. 6, 2008). The petitioner need not prove his innocence or that his detention is unlawful. See Al Mutairi v. United States, 644 F. Supp. 2d 78, 86 (D.D.C. 2009). Rather, the government must prove that it is more probable than not that he was part of or substantially supported the Taliban or al Qaeda. See Al Odah v. United States, No. 09-5331, slip op. at 10 (D.C. Cir. June 30, 2010) (preponderance of the evidence standard is constitutional in evaluating a *habeas* petition from Guantanamo Bay detainee).

The Supreme Court's decision in Boumediene left open the scope of the government's detention authority. See Boumediene v. Bush, 553 U.S. at ___, 129 S. Ct. at 2240.

SECRET//NOFORN

SECRET // NOFORN

In its wake, judges of this Court have issued numerous thoughtful opinions addressing the scope of the government's legal detention authority. See, e.g., Gherebi v. Obama, 609 F. Supp. 2d 43, 62-71 (D.D.C. 2009); Hamlily v. Obama, 616 F. Supp. 2d 63, 68-77 (D.D.C. 2009). The court of appeals recently resolved some of the different approaches taken by the judges of this Court in its decision in Al-Bihani v. Obama, 590 F.3d 866 (D.C. Cir. 2010). The court concluded that the government could lawfully detain "an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners," or "an individual [who] 'substantially support[s]' enemy forces." Id. at 872. This two-pronged definition — both membership and substantial support — includes "those who are part of al Qaeda or the Taliban or those who purposefully and materially support such forces in hostilities against U.S. Coalition partners." Id. The court of appeals concluded that "both prongs are valid criteria that are independently sufficient" to justify detention. Id. at 874.[1]

The government filed an amended Factual Return in this case on October 29, 2008. Petitioner filed a Traverse on May 29, 2009. The parties engaged in discovery and motions practice both before and after the filing of the Traverse. On August 5, 2009, over petitioner's objection, the Court granted the government's motion to stay the case on the ground that petitioner had been approved for transfer from Guantanamo Bay. See Sealed Memorandum Opinion and Order, Dkt. No. 183 (Aug. 5, 2009). The government was unable to secure

---

[1]      Because the Court concludes that the government has not shown by a preponderance of the evidence that petitioner had any association with or provided any support to al Qaeda, it need not address the question of what level of involvement and intent is necessary before someone is determined to be a part of or to substantially support a terrorist organization.

SECRET // NOFORN

petitioner's transfer by December 1, 2009, however, and the Court then lifted the stay and set a
schedule for briefing on the merits and a Merits Hearing. The Court thereafter ordered the
government to provide petitioner with additional discovery. The government was unable to
complete production of this discovery by the date of the Merits Hearing, but petitioner decided to
proceed with the Merits Hearing even though the discovery to which he was entitled had not been
fully produced.

Prior to the Merits Hearing, the Court issued an Order stating that it would admit
hearsay evidence, as required by the court of appeals' decision in Al-Bihani. See Almerfedi v.
Obama, Civil Action No. 05-1645, 2010 U.S. Dist. LEXIS 17706 at *2 (D.D.C. Mar. 1, 2010).
See also Al Odah v. United States, slip op. at 11 (hearsay evidence is admissible if it is reliable).
The Court explained that it would accord any evidence that had been created and maintained in
the ordinary course of business a rebuttable presumption of authenticity. See Almerfedi v.
Obama, 2010 U.S. Dist. LEXIS 17706 at *2 . But the Court denied the government's request to
give such evidence a presumption of accuracy. It stated that instead it would "consider the
accuracy, reliability, and credibility of all of the evidence presented on a case-by-case basis in the
context of the evidence as a whole and the arguments presented by counsel during the merits
hearing. . . . The proponent of any piece of evidence must establish its accuracy, reliability, and
credibility." See id. at *3.

## III. DISCUSSION

The government argues that petitioner is detained lawfully because he was part of
al Qaeda. More specifically, the government asserts that petitioner was an al Qaeda facilitator

5

SECRET // NOFORN

who frequented al Qaeda guesthouses in Iran██████████and helped fighters infiltrate Afghanistan from Iran to fight against coalition forces. The government also asserts that petitioner's active association with Jama'at al-Tablighi — an Islamic missionary organization that the government says provides logistical support and operational coverage to terrorist organizations — further justifies petitioner's lawful detention.

The government urges the Court to view the legality of petitioner's detention by looking at the totality of the evidence, which the Court has done. The Court has "evaluate[d] the raw evidence" to determine whether it is "sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty." Bensayah v. Obama, No. 08-5537, slip op. at 13 (D.C. Cir. June 28, 2010) (quoting Parhat v. Gates, 532 F.3d 834, 847 (D.C. Cir 2008)). When individual pieces of evidence are unreliable, however, the Court has not presumed their contents to be true in order to buttress the presumed accuracy of other flawed evidence. See, e.g., Al-Adahi v. Obama, Memorandum Opinion, Civil Action No. 05-0280, 2009 U.S. Dist. LEXIS 75108 at *17-18 (D.D.C. Aug. 21, 2009).

### A. Petitioner's Version of Events

Petitioner was born in Yemen in 1977. See Joint Exhibit ("JE") 76, Declaration of Hussain Salem Mohammad Almerfedi ("Almerfedi Decl.") ¶ 2. According to petitioner, he lived with his parents in Aden, a city in southern Yemen, until September 2001. See id. ¶¶ 2, 8. Petitioner's family is poor. See id. ¶ 4. While in Yemen, petitioner held a series of odd jobs. See id. ¶ 5.

SECRET // NOFORN

Petitioner claims that he wanted to leave Yemen and travel to Europe in order to find freedom, tolerance, and opportunity and to make a better life for himself. See Almerfedi Decl. ¶ 8; see also JE 9, FBI 302 of May 27, 2003 Interrogation of Petitioner ("FBI 302") at 1; JE 11, Criminal Investigation Task Force Summary of December ██ 2003 Interview of Petitioner ("CIT Summary"). Petitioner explained that it would have been difficult for him to obtain a European visa while in Yemen. See Almerfedi Decl. ¶ 9; FBI 302 at 2. His plan, as he explains it, was to travel from Yemen to Pakistan, a trip that was relatively inexpensive and easy to make, and then to associate himself with the Islamic missionary group Jama'at al-Tablighi ("JT"), which he hoped would fund and facilitate a missionary trip for him to Europe. See Almerfedi Decl. ¶ 10; FBI 302 at 2; CIT Summary.

According to petitioner, he flew from Sana'a, Yemen, to Karachi, Pakistan in early September 2001. See Almerfedi Decl. ¶ 9; FBI 302 at 2. He stayed in Karachi for approximately four days before traveling to Lahore, Pakistan. See Almerfedi Decl. ¶ 16; FBI 302 at 2; CIT Summary. Upon arriving in Lahore, petitioner went to the JT headquarters, where he stayed for approximately two and one half months. See Almerfedi Decl. ¶¶ 18, 21; FBI 302 at 2-3. Petitioner's plans for traveling to Europe with JT were derailed by the September 11, 2001 attacks on the United States. See Almerfedi Decl. ¶¶ 15, 22.

Petitioner states that while at the JT headquarters in Lahore he associated with a man ██████████████████████ See Almerfedi Decl. ¶ 18; FBI 302 at 2-3; CIT Summary. Petitioner explains that he paid ██ to smuggle him to Greece via Iran and Turkey. See Almerfedi Decl. ¶ 22; FBI 302 at 3; CIT Summary. According to petitioner, ██ smuggled

SECRET // NOFORN

petitioner over the border into Iran in November 2001. See Almerfedi Decl. ¶¶ 23, 24; FBI 302 at 3. They traveled to Tehran and then on to Mashad, a city in Northeast Iran near the Afghanistan border. See Almerfedi Decl. ¶ 25; FBI 302 at 3. Petitioner states that he remained in Mashad with ▮ for about one month, without taking any further steps towards continuing on his journey to Europe. See Almerfedi Decl. ¶ 26; FBI 302 at 3. Petitioner further states that he and ▮ eventually traveled back to Tehran in December 2001 or January 2002 where petitioner was immediately arrested by the Iranian police. See Almerfedi Decl. ¶ 27; FBI 302 at 3-4; CIT Summary. Petitioner has been in custody ever since, held first by the Iranians, then for almost a year in Afghanistan, and finally, since 2003, by the United States. See Almerfedi Decl. ¶¶ 32, 33.

### B. Al Qaeda Guesthouses in Iran; Petitioner as Al Qaeda Facilitator

As explained by the government, a network of guesthouses exists in Iran and Afghanistan, among other countries, which are used by al Qaeda as part of its terrorist mission.



SECRET // NOFORN



The Court notes that all of the government's background information regarding al

Qaeda guesthouses and their functions, including ███████████████ the declaration of

3 ███████████ of the Defense Intelligence Agency, <u>see</u> JE 4, relates to guesthouses in

Afghanistan or Pakistan, and does not specifically describe or discuss guesthouses in Iran.

Neither party has presented the Court with any evidence of whether al Qaeda guesthouses in Iran

are like or unlike those in Afghanistan and Pakistan.[2]

---

[2]     The court of appeals noted in <u>Al-Bihani</u> that "evidence supporting the military's
reasonable belief of [visiting al Qaeda guesthouses in Afghanistan] with respect to a non-citizen
seized abroad during the ongoing war on terror would seem to overwhelmingly, if not
definitively, justify the government's detention of such a non-citizen." <u>Al-Bihani v. Obama</u>, 590
F.3d at 873 n. 2. While proof that an individual stayed at an al Qaeda affiliated guesthouse in
Afghanistan or Pakistan, in the context of the facts and circumstances offered in evidence, may
suggest that that person is a part of or substantially supports al Qaeda, the government has not
proven that the word "guesthouse" is a term of art such that its use would always imply an al
Qaeda affiliation. This uncertainty about the use of the word "guesthouse" is all the greater given
the significant complications caused by Arabic translation. <u>See</u> JE 85, Declaration of Karen C.
Ryding, Ph.D., Concerning Arabic Interpretation Issues. In addition, the government has not
offered any evidence to show that a guesthouse in Iran is run in the same manner or serves the
same function as the Afghani or Pakistani guesthouses desribed by ███████████████

SECRET // NOFORN                                                        9

SECRET //NOFORN

The Court, however, need not resolve the difficult question whether proof that petitioner frequented Iranian guesthouses by itself would be adequate to justify his detention, because, as explained below, it finds that the government has not shown by a preponderance of the evidence that petitioner ever stayed in an Iranian guesthouse, let alone one run by or affiliated with al Qaeda.

The government's direct evidence that petitioner stayed in al Qaeda-sponsored guesthouses in Iran and from there was a facilitator for foreign fighters entering Afghanistan is comprised entirely of statements made by one other detainee at Guantanamo Bay — al-Jadani (ISN 230). Much of the government's case, therefore, turns on whether ISN 230 is a reliable source and whether the intelligence documents before the Court are reliable representations of his statements or his knowledge. The parties have presented extensive evidence about the general reliability of ISN 230 and about the credibility of reports created by his interrogator. Rather than draw a general conclusion as to the credibility of ISN 230 as a witness, the Court has examined in detail each of the six reports relied upon by the government to determine whether the particular information contained in each should be credited.

An additional wrinkle presents itself in the Court's evaluation of the utility of these intelligence reports. When ISN 230 refers to the man the government identifies as petitioner, he typically refers to him as "Hussain Al-Adeni." The government argues that the Court should treat this name as synonymous with petitioner. Deciding to do so is not a straightforward conclusion, however. Arabic names often include "nishas," a secondary name derived from a person's home region or city. See JE 6, Declaration of █ ████████

█ ▓▓▓▓▓▓ *Names, Alisas, Kunyas and Variants* at 2-3. Thus, for example, many people from Aden, petitioner's home city, might go by the name "Al-Adeni." Hussain is, of course, petitioner's first name. At times ISN 230 states that the Al Adeni to whom he refers is detained at Guantanamo. See JE 20. Even though it is possible that ISN 230 was referring to petitioner when he described the actions of "Hussain Al Adeni," the Court cannot be certain of this conclusion. Hussain is a very common name, and "Al-Adeni" could refer to any man from the city of Aden.[3] There is no evidence that ISN 230 was ever shown photographs of petitioner or that ISN 230 and petitioner knew each other prior to their detention at Guantanamo. Nor has the government presented evidence that petitioner referred to himself as "Al-Adeni" or that anyone else did so. While the Court will not discount entirely the documents in which ISN 230 refers to Al-Adeni, it cannot without further corroboration be certain that they refer to petitioner. See Mishal v. United States, 644 F. Supp. 2d 78, 96 (D.D.C. 2009) (finding identification of detainee unreliable because source referred to detainee by a different name).

### 1. The First Set of Intelligence Reports

The first document on which the government relies is a summary interrogation report ("SIR") of a █ ▓▓▓▓▓ interrogation of ISN 230. In that summary, ISN 230 is reported to have said that another detainee, Hamza Al-Gaetti (or Al-Qaiti), told him that in December 2001 Al-Gaetti and others were traveling back and forth from Afghanistan to a guesthouse in Tehran. See JE 18 at 1. ISN 230 also told his interrogator that, according to a group of unnamed

---

[3] For example, a man named Marwan Al-Adeni is reported to have supervised one of the guesthouses in Tehran. See JE 28 at 1.

11

SECRET //NOFORN

detainees who arrived in Guantanamo in 2004, people staying in the Tehran guesthouse were facilitators for al Qaeda fighters going into Konar, Afghanistan. See id. According to this group of detainees, both Tolfiq Nassar Ahmed Al-Bihani (ISN 893) and "Hussein ((Al-Adeni)), an Al-Qaida facilitator" were staying at the guesthouse. Id.

The second document relied upon by the government is a summary of a ██████ interrogation of ISN 230, which contains similar information. According to that summary, the unnamed group of detainees who arrived in Guantanamo in 2004 reportedly told ISN 230 that "those in residence at the guesthouse [in Tehran] were facilitators for Mujahideen going into Konar, Af. Detainee (SA-893 ((Al-Bihani)) Tolfiq Nassar Ahmed) and Hussein ((Al-Adeni)), an Al-Qaida facilitator, lived at the guesthouse in Tehran, Ir." JE 17 at 1.

The third document relied upon by the government is an ██████ summary of an interrogation of ISN 230. It also reports that ISN 230 said that "Hamza Al Gayetti and Abu Hassan traveled to Iran together and founded two small guesthouses in Tehran. They had two people at the guesthouses who are now here at Gtmo: ISN 893 and Hussain Al Adani, who is in ██████ JE 20 at 1.[4] The source for his information is not identified. See id.

Each of the three documents just discussed is a summary of an interview of ISN 230. These "summary interrogation reports" ("SIRs") are always ████████████████

████████████████████████

██████████████████████ See JE 47, Declaration of

---

[4] Neither petitioner nor the government has verified whether or not petitioner was, in fact, ██████ in Guantanamo at the time of this interrogation.

SECRET //NOFORN

▌3▐ ▌       ▐ (Sept. 19, 2008) at 7; JE 71, Declaration of ▌³▐

Decl.") ¶ 6. The final document in this group relied upon by the government is not an SIR but an "intelligence information report" ("IIR"). An IIR is a report written if an intelligence official determines that sufficient useful intelligence has been derived from human intelligence; it generally is to be disseminated more widely in the intelligence community than SIRs and synthesizes information from one or more SIRs. See JE 47 at 6-7.

The ▌2▐ IIR relied upon by the government contains virtually the same information that is contained in the three SIR's, except that for the first time ISN 230 purportedly provides dates for petitioner's alleged activities, stating that Al Adeni lived at the Tehran guesthouse from late 2000 into early 2001. See JE 26. These dates do not appear in any of the SIRs produced for the earlier interrogations of ISN 230. In fact, this is the only document presented to the Court that places petitioner in Iran before the Fall of 2001. Assuming that ISN 230 actually made the statement about these dates, it must have been during an interrogation for which the government has not produced a summary contemporaneously prepared by the interrogator. The Court would have more confidence in the accuracy of the statements contained in this IIR if it had access to all of the underlying documents from which it was produced or if there was any evidence in the record to corroborate them. Cf. ▌   ▐ Decl. ¶ 7 ▌  ▐ interviewed ISN 230 approximately 100 times).

The Court finds these four intelligence documents inherently unreliable. The only source identified for ISN 230's information about petitioner is an unnamed group of detainees who arrived in Guantanamo in 2004. Not only does ISN 230 not identify who they are, but there

SECRET // NOFORN

is no information provided about the source or sources of the group's information. It could be based on personal knowledge, hearsay, multiple hearsay, or rumor. Although hearsay evidence is admissible in these proceedings, the Court still must determine whether the hearsay statements are accurate, reliable and credible. Information that came from an unnamed group of detainees, for which the original source cannot be pinpointed, amounts to no more than jailhouse gossip, if that, and cannot serve as the basis for petitioner's detention. The Court will not credit any of these four documents.

In any event, the government has not shown by a preponderance of the evidence that the petitioner was ever in Iran before the Fall of 2001, so it is most unlikely that petitioner could have been in a guesthouse in Tehran in 2000 or early 2001. While the government points out that petitioner has not produced any evidence corroborating his assertion that he did not leave Yemen until early September 2001 and did not arrive in Iran until November 2001, information which does seem obtainable, the government has not produced any evidence to the contrary — other than the unreliable IIR that purports to place petitioner in Iran prior to November 2001.[5] And, it must be remembered, the burden of proof is on the government throughout these proceedings.

---

[5]



SECRET//NOFORN

## 2. Two Additional Intelligence Documents

The Court now turns to two additional intelligence documents relied on by the government and derived from later interrogations. In each of these documents, ISN 230 purports to be relaying information that he learned directly from petitioner. To support the reliability of these documents, the government points out that from October 2003 through June 2004 ISN 230 was housed in the same cell block as was petitioner, and that in April and May of 2006 they shared the same recreation yard. See JE 73, Declaration of ████████████ ¶¶ 3-5. The government argues that this proximity enabled ISN 230 to speak directly with petitioner and that the Court therefore should credit the information that ISN 230 says he learned from petitioner. In addition, because the statements purportedly made by petitioner to ISN 230 concern the same matters that were the subject of the hearsay statements in the four documents discussed in Part III.B.1, the government attempts through these additional documents to bolster the reliability and trustworthiness of the others.

In a September 22, 2006 summary of interrogation report, ISN 230 is reported to have said that he had the opportunity to speak with Hussain Al-Adeni, who told ISN 230 that he had been housed in a guesthouse in Tehran and that there were two guesthouses in Tehran, one of which was supervised by Hamza Al-Qaiti. See JE 19 at 1. There is other information about this guesthouse reported in the SIR, but ISN 230 does not suggest that petitioner was the source for this additional information.[6]

---

[6] The government points out that by September 2006, when this SIR was prepared, ISN 230 knew the circumstances of petitioner's capture — he reported to the interrogator that Hussain Al-Adeni was captured in Iran, that later that year he was returned to the Afghans, and

SECRET//NOFORN

15

SECRET//NOFORN

An ▮▮▮▮▮▮▮ IIR based on interrogations of ISN 230 reports that ISN 230 told his interrogator that "according to detainees SA-893, Tolfiq Nassar Ahmed ((Al-Bihani)), and YM-1015, Hussein Salem ((Mohammed)), there were two guesthouses in Tehran. . . . Hamza Al-Qaiti supervised the second guesthouse . . . According to detainees SA-893 and YM-1015, Al-Qaiti received money from Bin Laden for the maintenance of both guesthouses. . . . Sometime during 2002 and 2003, SA-893, Tolfiq Nassar Ahmed ((Al-Bihani)), and YM-1015, Hussein Salem ((Mohammed)), lived in the second guesthouse for lower ranking fighters." JE 28 at 1.[7] This IIR also states: "In approximately 2002, YM-1015 was captured in IR . . . Later in 2002, YM-1015 was returned to the Afghans and the Afghans turned YM-1015 over to the Americans." Id. at 2. ISN 230 did not describe petitioner as a "facilitator" in either of these reports.

Although these documents do not suffer from the same hearsay problems as do the first four intelligence reports, there are other reasons to question their accuracy and reliability. Only in the ▮▮▮▮▮▮▮ IIR is it stated that ISN 230 ever referred to petitioner by his given name, but in this report he states that petitioner was in the Tehran guesthouse during 2002 and 2003. It was, however, virtually impossible for petitioner to have been in a Tehran guesthouse during those years. It is undisputed that the Iranian authorities arrested him in either December

---

that the Afghans turned Al-Adeni over to the Americans — which corroborates the government's argument that references to Hussain Al-Adeni are references to the petitioner. See JE 19 at 1. On the other hand, ISN 230 misreports the date that petitioner arrived in Guantanamo as 2002, when in fact it was 2003. See id.

[7]     YM-1015 is petitioner.

SECRET//NOFORN

16

SECRET //NOFORN

2001 or January 2002 and that he has been in custody ever since. Indeed, in a later paragraph of the same IIR, ISN 230 is said to have reported that YM-1015 was captured in Iran in 2002 and then, "later in 2002," he was returned to the Afghans and ultimately turned over to the Americans. Id. at 2. See also JE 34 at 1 (interrogation notes of petitioner interview stating that petitioner was captured in Tehran in January 2002); JE 50 at 5 (intelligence summary stating that detainee identified by government as petitioner was arrested in Tehran in December 2001). While the Court will accept the government's suggestions that ISN 230 simply was mistaken when he mentioned calendar year 2003, or that his interrogator misreported what he said, or that the person who synthesized various SIR's summarized them inaccurately, this mistake raises additional questions about the credibility of ISN 230 or the reliability of the interrogator or other government personnel.

In any event, that leaves the government to argue only that petitioner could have been in a Tehran guesthouse "for a portion of 2002" see Transcript of Merits Hearing at 57 (Mar. 3, 2010) -- in other words, during the month of January 2002. This one-month window is a slender reed on which to base the argument that these two documents support petitioner's detention. The government essentially urges the Court to accept as true only the information in these interrogation documents that supports petitioner's detention, while discounting information that conflicts with its theory for detention.

In addition, the [2]                    IIR attributes the information provided by ISN 230 to statements allegedly jointly or separately made to him by petitioner and by SA-893, Al-Bihani. But Al-Bihani's own statements under oath are inconsistent with what ISN 230

SECRET //NOFORN

17

reports that Al-Bihani and petitioner allegedly told him about their stay in Iranian guesthouses in 2002 and perhaps 2003. Significant doubt exists as to whether ISN 893 was ever in a Tehran guesthouse, or certainly that he was in one at the same time as petitioner. See JE 91, Declaration of Toffiq al Bihani ¶ 28 (stating that he was arrested almost immediately after crossing the border into Iran within the weeks or months after September 11, 2001); JE 92 at 2 (intelligence report of FBI interrogation in which Al-Bihani denies being in Iran prior to 2002). Al-Bihani's statements that he was in a Tehran guesthouse in 2000, JE 52, and in a▮▮▮▮▮ guesthouse after September 11, 2001, JE 53, hardly support the government's theory that he and petitioner stayed together in a Tehran guesthouse in 2002 or possibly 2003.

The documents just discussed are the government's only direct evidence that petitioner stayed in al Qaeda guesthouses in Tehran in 2002. For the reasons just explained, however, they cannot be credited.

The government has identified other evidence that it maintains corroborates ISN 230's statements. Specifically, it points out that petitioner admitted to being in Iran in late 2001 or early 2002. See Almerfedi Decl. ¶¶ 25, 27. It notes that ISN 893, Al-Bihani, stated that he was in the same prisoner exchange between Iran and Afghanistan in mid-March 2002 as Hussain Al-Adeni, which the government argues would put Al-Bihani in Iran at the same time as petitioner. See JE 30 at 1. ISN 893 also has admitted to meeting with Hamza Al-Qaiti, which the government says provides some corroboration for ISN 230's statements that ISN 893 stayed in Al-Qaiti's guesthouses in Tehran with petitioner. See JE 53 at 2. Furthermore, as the government correctly points out, petitioner's story that he stayed in Mashad, Iran for one month

SECRET // NOFORN

without making any additional effort to continue his journey to Europe is, at the very least, perplexing. Mashad is much closer to the border with Afghanistan than it is to the border with Turkey. On the other hand, petitioner has consistently asserted that he was in the control of Muhammad Ali, he did not speak Farsi, and he had little experience with foreign travel, much less with illegal border crossings. Unfortunately for the government -- which bears the burden of proof in these proceedings -- these snippets of circumstantial or "corroborating" evidence add little to the government's unreliable direct evidence that petitioner stayed in Tehran guesthouses in 2002, or, indeed, at any time.

### 3. Was Petitioner an Al Qaeda Facilitator?

As for the government's contention that petitioner was an al Qaeda facilitator in Iran helping fighters infiltrate Afghanistan, the government has provided no direct or persuasive circumstantial evidence other than petitioner's alleged association with Iranian guesthouses and the description of petitioner as a "facilitator" in the unreliable documents discussed in Part III.B.1. If petitioner had been a "facilitator" for al Qaeda, other witnesses likely would have known about it and would have been able to testify about his work for al Qaeda. The government has presented no such evidence, no evidence of petitioner's motive, no evidence that he had any history of anti-western or pro-al Qaeda beliefs, and no evidence that he associated with those who advocated such beliefs. Nor is there any evidence that petitioner, who is uneducated, is a sophisticated traveler or document forger — skills that likely would be necessary for al Qaeda facilitators. Furthermore, it is implausible that al Qaeda would post petitioner to a

SECRET // NOFORN

guesthouse in Tehran, because it is undisputed that he does not speak Farsi.[8] Most importantly, having failed to prove that petitioner stayed at al Qaeda guesthouses in Iran in 2000 and early 2001, the argument that he facilitated the movement of foreign fighters into Afghanistan while residing in such guesthouses during that period falls of its own weight.[9]

A handful of interrogation reports, based upon at least one, and frequently numerous levels of hearsay, which may not even be referring to petitioner, which report implausible allegations alongside a few arguably incriminating ones, and which are not supported by significant additional corroborating evidence, do not show by a preponderance of the evidence that petitioner stayed in a Tehran guesthouse, much less that he was a facilitator for al Qaeda.



---

[8] The government makes much of the fact that petitioner was carrying a significant amount of cash when he was arrested in Tehran, but he explained that he had saved the money for years in order to finance his immigration to Europe. The parties dispute the amount of cash that petitioner would have had at the time he was captured if it were his own savings and not al Qaeda funds, but this dispute does not aid the Court in its resolution of this issue.

[9] The government's argument that petitioner was an al Qaeda facilitator is even weaker with respect to its assertions that petitioner also stayed in al Qaeda guesthouses in Iran in 2002 and (perhaps) 2003. Neither the September 22, 2006 SIR nor the [ ] IIR describe petitioner as a facilitator during this period.

SECRET // NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE



UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET // NOFORN



SECRET//NOFORN

### D. Petitioner's Association with Jama'at al-Tablighi

The government argues that, in conjunction with its other evidence, evidence of petitioner's association with Jama'at al-Tablighi at the same time this organization was helping foreign fighters flee Afghanistan supports petitioner's legal detention. The government does not argue that petitioner is lawfully detained "simply because he admitted to associating with JT." Respondent's Opposition to Petitioner's Motion for Judgment on the Record and Memorandum in Support at 23. Rather, it argues that the circumstances of his involvement with JT "are consistent with other evidence in this case establishing that petitioner was an al Qaeda facilitator who frequented al-Qaeda guesthouses in Iran                            Id. See also Transcript of Merits Hearing at 12 (Mar. 5, 2010).

JT is a complex organization. The Islamic scholar, Dr. Qamar-ul Huda, explains that JT originated in British India as a response to aggressive conversion campaigns by Hindu fundamentalist and Christian religious groups. See JE 78, Letter from Qamar-ul Huda at 1. Its emergence was part of a broader trend of Islamic revivalism or the reaffirmation of faith and Muslim cultural identity. See id. JT hosts an annual meeting in Raiwind, Pakistan that attracts approximately one million people from 85 countries, the second largest gathering of Muslims after the pilgrimage to Mecca. See id. at 3. The teachings of JT emphasize internal change, not political doctrine. See id. at 2-3.

The government's own intelligence documents describe JT as a "legitimate Islamic missionary group."               see also JE 32 at 1 (describing missionary activities of JT). The government argues, however, that although JT functions as a legitimate organization,

SECRET//NOFORN

23

SECRET // NOFORN

Islamic extremists worldwide, including al Qaeda, have infiltrated it and have used it as a cover for terrorist activities. The United States government has classified JT as a █ Terrorist Support Entity, which means that the government believes it has "demonstrated intent and willingness to provide financial support to terrorist organizations willing to attack U.S. persons or interests, or provide witting operational support to █ terrorist groups." JE 47, Declaration of █ at 25 (Sept. 19, 2008). An intelligence report 2 █ 2 █ states that the "Tablighi Jamaat organization has been supporting Islamic terrorist groups in South and Southeast Asia under the cover of conducting religious activities. The group is closely aligned with other Pakistani terrorist organizations and the Al-Qaida network." JE 31 at 3.[12] The Court has no reason to question any of these assertions.

According to the government, the organizations or persons who have infiltrated JT are terrorists and use the organization as a cover to assist the movement of fighters between Pakistan and Afghanistan. The government presented statements from three other detainees who admit that they were assisted by JT in some way during or after time spent fighting on behalf of al Qaeda in Afghanistan. ISN 702, who the government asserted trained at the al Qaeda training camp al Farouq, admitted that he stayed in JT's Center in Lahore, Pakistan for two to three months for free, much like petitioner did. See JE 62 at 2.[13] ISN █ told the FBI that after

---

[12] The sources for this report are the websites of three news organizations — the PakTribune, the Asia Times, and the South Asia Analysis Group. See JE 31 at 1.

[13] ISN 702 later disavowed training at al Farouq, but, like petitioner, he did not disavow staying at the JT Center in Lahore, Pakistan. See PE 7, Declaration of Ravil Mingazov ¶ 16 ("I was with the Muslims of the Tablisghi for approximately two months in early 2002. I was never a member of the Tablighi organization. I never heard or observed anything that would lead me to believe that the Tablighi was involved in any way with militant or terrorist activity.").

SECRET // NOFORN

SECRET //NOFORN

spending approximately two months fighting for the Taliban in Afghanistan, he fled to Pakistan and stayed in a house in Lahore run by JT members, which he described as "a group that shelters and gives aid to Muslims in Pakistan attempting to return to their own countries." See JE 61 at 3. An interrogation report of ISN 703 reports him telling his interrogator that JT members assisted him and other Taliban fighters fleeing Afghanistan by giving them Pakistani clothes, instructing them to shave their heads, and driving them to Lahore and housing them there. See JE 33 at 2. ISN 839 also described the assistance that JT provided him in leaving Afghanistan, and getting to Lahore, Pakistan; he told his interrogator that JT members were in Afghanistan assisting foreigners with travel out of the country. See JE 32 at 2.

The government argues that the details of petitioner's association with JT are sufficiently suspicious to raise doubts about his story that he only approached the organization in order to secure a trip to Europe. Instead, it argues, petitioner's association with JT corroborates the assertion that petitioner was an al Qaeda facilitator who provided the kind of assistance to fighters fleeing Afghanistan described by ISN 703. See Transcript of Merits Hearing at 12 (Mar. 5, 2010). The government points out that while still in Yemen, petitioner claimed to be a member of JT when he bribed a guard at the Pakistani embassy in order to receive a visa and when he purchased his airplane ticket at a travel agency in order to receive a discount. See JE 9 at 1-2. Furthermore, even though he is not religious and had no interest in participating in JT's

---

In the time since the Merits Hearing in this case, Judge Kennedy granted ISN 702's petition for a writ of *habeas corpus*, and, in the accompanying Opinion, concluded that the government had not shown by a preponderance of the evidence that ISN 702 stayed at al Farouq or that he fought on behalf of any terrorist organization. See Al-Harbi v. Obama, Civil Action No. 05-2479, 2010 U.S. Dist. LEXIS 59666 at *46, 61-62 (D.D.C. May 13, 2010).

SECRET //NOFORN

SECRET // NOFORN

religious activities, see Almerfedi Decl. ¶ 17, petitioner stayed at the JT Center in Lahore for approximately two and one half months beginning in September 2001. See id. ¶ 21; see also JE 9 at 1-2.

The evidence that the government has presented strongly suggests that individual JT members or those who had infiltrated JT assisted foreign fighters traveling between Afghanistan and Pakistan, and served as a cover for terrorist groups, and that al Qaeda or Taliban members have stayed at the JT Center in Lahore or in other JT facilities. The government has not presented evidence, however, that leads the Court to conclude that such assistance was official or otherwise known JT policy, or even that a substantial number of those at the Center in Lahore were associated with al Qaeda or assisting those associated with al Qaeda. JT is by all accounts a massive organization, and any assistance provided by its members to al Qaeda or the Taliban, may have been the work of individual members or factions, not the organization as a whole. Thus, while it certainly appears more likely than not that some elements of JT, including some at the JT Center in Lahore, provide financial and other support to Islamic terrorist groups, this premise does not lead to the conclusion that petitioner did so.

Petitioner has not provided a convincing explanation for why he stayed in the JT Center for two and one half months without pursuing his stated goal of going to Europe, what he was doing during that period of time, or even why he did not seek out other Arabic speakers aside from Mohammad Ali. See Almerfedi Decl. ¶¶ 18, 21. Nevertheless, the strange and unexplained circumstance of these two and one half months does not lead to the conclusion that petitioner worked as an al Qaeda facilitator while at the JT Center or thereafter at al Qaeda

guesthouses. See Bensoyah v. Obama, No. 08-5537, slip op. at 17 (D.C. Cir. June 28, 2010) (questions about a petitioner's whereabouts or explanations may undermine his credibility but do not by themselves "tie[] him to al Qaeda or suggest[] he facilitated anyone's travel during that time"). While the government has cast suspicion on petitioner's explanation and raised doubts about parts of petitioner's story — a story which he has told consistently since the time of his capture — the government simply has not shown by a preponderance of the evidence that petitioner had any ties to al Qaeda or to the Taliban or that he ever stayed at an al Qaeda guesthouse in Iran

To the extent that evidence about petitioner's association with JT was offered to "corroborate the [government's] evidence that establishes petitioner's role as a facilitator for al Qaeda in Iran," Respondents' Motion for Judgment on the Record and Memorandum in Support at 12, it fails utterly to do so. There is no evidentiary basis on which to conclude that petitioner's association with JT or his stay in its Lahore Center, either standing alone or in conjunction with other evidence presented by the government, are adequate to justify petitioner's detention. See Abdah v. Obama, Civil Action No. 04-1254, 2010 U.S. Dist. LEXIS at *43-44 (D.D.C. May 26, 2010) (refusing to draw inculpatory inference from detainee's association with JT).

SECRET // NOFORN

## IV. CONCLUSION

For the reasons stated above, the Court concludes that the government has failed

to meet its burden of showing by a preponderance of the evidence that petitioner's detention is

lawful. The Court will grant the petition for a writ of *habeas corpus*. An Order consistent with

this Opinion will issue this same day.

PAUL L. FRIEDMAN
United States District Judge

DATE: 7/8/10